# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE JAN 2 3 2014



CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Jan 23 2014

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

MARC YOUNGS,

              Petitioner,

    v.

PEACEHEALTH, a Washington corporation
d/b/a PEACEHEALTH ST. JOSEPH
MEDICAL CENTER and d/b/a
PEACEHEALTH MEDICAL GROUP, and
UNKNOWN JOHN DOES,

              Respondents.

---

AOLANI E. GLOVER, a single individual,

              Respondent,

    v.

THE STATE OF WASHINGTON d/b/a
HARBORVIEW MEDICAL CENTER; and
LULU M. GIZAW, PA-C,

              Petitioners.

NO. 87811-1

EN BANC

Filed     JAN 2 3 2014

GORDON MCCLOUD, J.— The question presented in this case is whether *Loudon v. Mhyre*, 110 Wn.2d 675, 677, 756 P.2d 138 (1988), which prohibits defense counsel in a personal injury case from communicating ex parte with the plaintiff's nonparty treating physician, applies to such physicians when they are employed by a defendant. Specifically, we are asked whether *Loudon* bars ex parte communications between a physician and his or her employer's attorney where the employer is a corporation and named defendant whose corporate attorney-client privilege likely extends to the physician, at least as to certain subjects. To answer this question, we must balance the values underlying the attorney-client privilege against those underlying the physician-patient privilege.

The legislature codified the attorney-client privilege in RCW 5.60.060(2)(a). "The attorney-client privilege 'is the oldest of the privileges for confidential communications known to the common law.' Its aim is 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'"[1] The United States Supreme Court's decision in *Upjohn Co. v. United States*, 449 U.S. 383, 386,

---

[1] *United States v. Jicarilla Apache Nation*, ___ U.S. ___, 131 S. Ct. 2313, 2320, 180 L. Ed. 2d 187 (2011) (citations omitted) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)).

390, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981) holds that the attorney-client privilege

extends to corporate clients. This remains the law today.[2]

The legislature has also enacted a physician-patient privilege statute, RCW

5.60.060(4). That privilege aims to "protect[] the sanctity" of the doctor-patient

relationship; to recognize that the "'relationship between physician and patient is "a

fiduciary one of the highest degree . . . involv[ing] every element of trust, confidence

and good faith"'[;] to surround patient-physician communications with a cloak of

confidentiality to promote proper treatment by facilitating full disclosure of

information"; and "to protect the patient from embarrassment or scandal which may

result from revelation of intimate details of medical treatment."[3] *Loudon*, barring ex

parte contacts, is designed in part to safeguard that privilege. As discussed below,

it survives the 1986 and 1987 amendments to the physician-patient privilege statute.

The physician-patient privilege and the bar on defense counsel's ex parte contacts

---

[2] This court has cited *Upjohn* favorably on a number of occasions. *See, e.g., Wright v. Group Health Hosp.*, 103 Wn.2d 192, 202, 691 P.2d 564 (1984) ("In enunciating a flexible 'control group' test, the *Upjohn* Court was expanding the definition of 'clients' so the laudable goals of the attorney-client privilege would be applicable to a greater number of corporate employees."); *Sherman v. State*, 128 Wn.2d 164, 190, 905 P.2d 355 (1995) (citing *Upjohn* for the principle that corporate attorney-client privilege might shield certain correspondence from discovery).

[3] *Smith v. Orthopedics Intern., Ltd.*, 170 Wn.2d 659, 667, 244 P.3d 939 (2010) (internal quotation marks omitted) (quoting *Loudon*, 110 Wn.2d at 679 and *Carson v. Fine*, 123 Wn.2d 206, 213, 867 P.2d 610 (1994)).

with a plaintiff-patient's nonparty treating physician thus also remain the law of our state.

In these consolidated medical malpractice cases, the *Upjohn* case, which defines the scope of the corporate attorney-client privilege, and the *Loudon* rule, which creates procedures to protect the physician-patient privilege, conflict. On the one hand, *Upjohn* would allow corporate counsel to have privileged (confidential and private) discussions with corporate employees, including a plaintiff's nonparty treating physician, to investigate claims and prepare for litigation. On the other hand, *Loudon* would bar confidential discussions between defense counsel and the plaintiff's nonparty treating physicians about the subject of the litigation—*Loudon* would require that such preparation take place in the presence of opposing counsel. This court must resolve that conflict.

We reject the suggestion (of plaintiffs and amicus Washington State Association for Justice Foundation (WSAJF)) that the test announced in *Wright v. Group Health Hospital*, 103 Wn.2d 192, 691 P.2d 564 (1984), resolves the conflict. That test was designed to "prevent situations in which a represented party may be taken advantage of by adverse counsel," *id.* at 197, not to protect the plaintiff's physician-patient privilege or the corporation's attorney-client privilege. We also reject the suggestion (of defendants and amicus Washington Defense Trial Lawyers)

4

that *Upjohn* completely trumps *Loudon*. It does not. *Upjohn* decides which corporate employees' communications with corporate counsel are protected by the attorney-client privilege; it bases this decision on policy determinations about how much confidentiality is needed to further the values upon which the attorney-client privilege is based. Those values are certainly at play in this case—the corporate defendant has a right to advice, counsel, and litigation expertise. *Loudon* decides something different: the manner in which defense counsel may communicate with a plaintiff's nonparty treating physicians, consistent with the physician-patient privilege. *Loudon* bases this decision primarily on the policy concerns underlying that privilege, that is, the need to protect patient confidentiality and foster the fiduciary relationship between such physicians and their patients. Those concerns are also at play in these cases—the plaintiff-patients who may have suffered injury due the defendants' negligence should not be forced to suffer the additional injury of a privacy invasion implicating the most intimate details about their bodies and health.

To protect the values underlying both the physician-patient and the attorney-client privileges, we adopt a modified version of the *Upjohn* test in this context. Under this test, an attorney hired by a defendant health care provider to investigate or litigate an alleged negligent event may conduct privileged ex parte

communications with a plaintiff's nonparty treating physician only where the communication meets the general prerequisites to application of the attorney-client privilege,[4] the communication is with a physician who has direct knowledge of the event or events triggering the litigation, and the communications concern *the facts of the alleged negligent incident.*

As always, the attorney-client privilege protects the privileged communications only—not the facts transmitted in those communications. Facts are proper subjects of investigation and discovery, even if they are also the subject of privileged communications. *Wright*, 103 Wn.2d at 195 (citing *Upjohn*, 449 U.S. at 395-96). Hence, *Wright* still governs ex parte contacts between plaintiff's counsel and the corporate-defendant's employees—even if they are the same physician-employees who might have privileged conversations with corporate counsel.

FACTS

1. *Youngs v. PeaceHealth*

Plaintiff Marc Youngs was admitted to defendant PeaceHealth's Bellingham, Washington, facility, St. Joseph Hospital, for lung surgery in December 2008.

---

[4] *See generally Haines v. Liggett Group Inc.*, 975 F.2d 81, 90 (3d Cir. 1992) ("The privilege extends to verbal statements, documents and tangible objects conveyed by both individual and corporate clients to an attorney in confidence for the purpose of any legal advice.").

There, he developed sepsis resulting in the loss of both his legs below the knee and both his hands above the wrist. He brought an action against PeaceHealth for negligent postoperative care under the "Doctrine of Corporate Negligence," the "Doctrine of Respondeat Superior," and the "Doctrine of Res Ipsa Loquitur"; and "for failure to obtain an informed consent." Clerk's Papers (CP) at 214. In his complaint, he identified Drs. Richard Leone and Donald Berry as physicians whose conduct gave rise to his lawsuit, but he did not name those doctors as defendants. Mr. Youngs did not object to ex parte contacts between PeaceHealth's defense counsel and Drs. Leone or Berry. But he did object to defense counsel's ex parte contacts with any other physician who treated him at St. Joseph, even though he had responded to interrogatories in a manner that suggested he might bring claims implicating several additional, unidentified physicians. Citing *Loudon*, Mr. Youngs moved to prohibit "defense counsel from ex parte contact, directly or indirectly, with any of plaintiff Marc Youngs' treating health care providers, with the exception of Dr. Richard Leone, and Dr. Donald Berry." CP at 251. The trial court granted the motion, and PeaceHealth moved to reconsider. The trial court then reversed, stating that "counsel for PeaceHealth may have ex parte contact with PeaceHealth employees who provided health care to plaintiff Marc Youngs." CP at 9.

2. *Glover v. State of Washington d/b/a Harborview Medical Center*

Aolani Glover went to the Harborview Medical Center (Harborview) emergency room on April 2, 2008, after developing chest pain that she said she had never before experienced. Harborview is owned by defendant Washington State and managed by the University of Washington (UW) medical system. Ms. Glover was 28 years old when she visited the Harborview emergency room on April 2 and was apparently otherwise in good health. According to Ms. Glover, she was made to wait about four hours for treatment. Once she was admitted for treatment, Ms. Glover contends that she was "parked" on a gurney in the hallway, where she waited another hour for a nurse to take her vital signs and perform blood work. Resp't's Br. at 2. The blood work revealed elevated troponin levels, which indicate myocardial infarction (heart attack). Ms. Glover contends that lab results showing the elevated troponin levels were available when Lulu Gizaw, a physician's assistant, first saw her. Mr. Gizaw nevertheless discharged Ms. Glover, telling her that she was not having a cardiac event. Mr. Gizaw maintains that he had reviewed another patient's blood work results, mistaking them for Ms. Glover's. When he discovered his error, Mr. Gizaw tracked Ms. Glover down at Harborview's outpatient pharmacy and requested that she return to the emergency department. She returned, was reexamined, and was subsequently taken to Harborview's cardiac catheterization room. There, doctors discovered that Ms. Glover had suffered a right

coronary artery dissection. Ms. Glover contends that this condition, if untreated, "causes myocardial infarction and can later cause sudden cardiac death." Resp't's Br. at 4 n.3. Immediately after her arrival in the catheterization room, Ms. Glover had several cardiac arrests.

Cardiac surgeons at Harborview tried to repair the damage to Ms. Glover's artery using a stent but ultimately had to place a pacemaker and balloon pump. After receiving the pacemaker and pump, Ms. Glover was transferred to the intensive care unit, where she remained, unconscious, for three days. She was then transferred, still unconscious and in critical condition, to UW Medical Center (UWMC), another facility in the UW medical system, where surgeons placed a temporary ventricular assist device. UWMC discharged Ms. Glover 17 days later, but she returned after three weeks, complaining of more chest pains. At that point, UWMC doctors found further dissection in her coronary arteries. Ms. Glover underwent a heart transplant on June 27, 2008, at UWMC.

Ms. Glover alleges that the Harborview emergency staff was too slow to recognize that she was suffering a cardiac event and that they therefore negligently delayed her transfer to the catheterization room. She makes no allegations of negligence concerning the care she received after Mr. Gizaw convinced her to return to the emergency department for readmission.

Initially, Ms. Glover asserted that *Loudon*, and its progeny, barred ex parte communications between defense counsel and Ms. Glover's treating physicians at Harborview outside the emergency department. Later, however, she indicated that she did not object to defense counsel's ex parte contacts with "any of the [Harborview] Emergency Department or Cardiology staff ... involved in [Ms. Glover's] care, so long as those individuals were not shown any records of her subsequent care [at UWMC]." CP at 32. In response to Ms. Glover's motion, the trial judge issued a protective order stating that "Defense Counsel and the defendant's risk manager are prohibited from ex parte contact, directly or indirectly, with any of Plaintiff Aolani Glover's treating physicians at University of Washington Medical Center." CP at 170.

3. Procedure in Both Cases

In both cases, the trial court certified its order on ex parte contacts for discretionary review. The Court of Appeals consolidated the cases and transferred them here pursuant to RCW 2.06.030. We agreed that the cases present issues of broad public import requiring prompt determination, and we granted review.

Defendant PeaceHealth argues that *Loudon* was superseded by amendments to the patient privilege statute in 1986 and 1987; the amendments now make waiver of the physician-patient privilege automatic "as to all physicians or conditions," 90

days after a claimant files an action for personal injuries or wrongful death. LAWS OF 1987, ch. 212, § 1501; LAWS OF 1986, ch. 305, § 101; RCW 5.60.060(4)(b). PeaceHealth contends that the physician-patient privilege is purely statutory, with no basis in common law, so there is nothing left for *Loudon* to protect, postwaiver. Both defendants claim that even if *Loudon* did survive the statutory amendments, *Loudon*'s protections still do not apply to the plaintiff's nonparty treating physician when that physician is employed by the defendant health care provider. The defendants reason that applying *Loudon* in that context would conflict with both the attorney-client privilege and hospital regulatory statutes governing patient confidentiality and health care quality improvement.

We hold that *Loudon*'s bar on ex parte contacts survived the 1986 and 1987 amendments to Washington's physician-patient privilege statute, and that *Loudon*'s protections apply to nonparty treating physicians employed by a defendant hospital, but that where the plaintiff's treating physician is employed by the defendant, the *Loudon* rule is limited by the defendant organization's corporate attorney-client privilege as summarized in the introduction and discussed more fully below. We also hold that a trial court may not restrict communications between a hospital's employees and quality improvement committee but that members of the committee

11

must be screened from defense counsel in an action against the hospital for negligence or medical malpractice.

## ANALYSIS

1. *Loudon* survives the 1986/1987 amendments to the physician-patient privilege statute

When the *Loudon* plaintiffs initiated their original action, Washington's physician-patient privilege statute had no waiver provision. Nevertheless, personal injury plaintiffs were still deemed to have "waived" the privilege at some point prior to trial by filing suit. Under that statutory regime, trial courts determined on a case-by-case basis when the plaintiff had waived the privilege by putting his or her medical condition in issue. *See Phipps v. Sasser*, 74 Wn.2d 439, 445 P.2d 624 (1968); *Bond v. Indep. Order of Foresters*, 69 Wn.2d 879, 421 P.2d 351 (1966); *Randa v. Bear*, 50 Wn.2d 415, 312 P.2d 640 (1957); *McUne v. Fuqua*, 42 Wn.2d 65, 253 P.2d 632, 257 P.2d 636 (1953).

In 1986, our legislature amended the physician-patient privilege statute to provide that "[w]aiver of the physician-patient privilege for any one physician or condition constitutes a waiver of the privilege as to all physicians or conditions, subject to such limitations as a court may impose pursuant to court rules." LAWS OF 1986, ch. 305, § 101(4)(b). In 1987, the legislature further amended it, making

waiver automatic 90 days after the filing of a claim for personal injury or wrongful

death. LAWS OF 1987, ch. 212, § 1501(1)(b). Defendant PeaceHealth argues that

these waiver amendments supersede the *Loudon* rule and thus deprive a personal

injury plaintiff of the privilege *absolutely*, 90 days after he or she files suit.

This argument fails. The 1986 and 1987 amendments did not create a new

waiver. Rather, they codified a judge-made waiver that was already well established

when *Loudon* was decided.[5]

---

[5] This court discussed the purpose of the amendments in *Carson v. Fine*, 123 Wn.2d 206, 213-14, 867 P.2d 610 (1994), where it explained that they did little to change preexisting judge-made rules regarding waiver of the patient privilege. The 1986 amendment codified a rule that prevented physician witness-shopping, while the 1987 amendment did away with the case-by-case waiver analysis, instituting the blanket 90-day waiver rule:

> A patient who could select among various physicians' opinions, and claim privilege as to the remainder, would make a mockery of justice. [*State v.*] *Tradewell*, 9 Wn. App. [821, 824, 515 P.2d 172 (1973)]; *see also State v. Brewton*, 49 Wn. App. 589, 591, 744 P.2d 646 (1987). . . . This conclusion is now expressly set forth in [the 1986 amendment] . . . .

*Id.* at 214.

> The [1987] amendment is a codification of existing Washington case law which holds that waiver occurs even without plaintiff's express consent. Specifically, this court has held that the introduction by the patient of medical testimony describing the treatment and diagnosis of an illness waives the privilege as to that illness, and the patient's own testimony to such matters has the same effect.

*Id.* at 213.

13

Indeed, the *Loudon* court devoted a significant portion of its analysis to that judge-made waiver rule. Its analysis makes clear that a waiver of the patient privilege triggers, rather than cancels, the *Loudon* protections:

> A patient may *waive* [the physician-patient] privilege by putting his or her physical condition in issue. *See Randa v. Bear*, 50 Wn.2d 415, 312 P.2d 640 (1957); *Phipps v. Sasser*, 74 Wn.2d 439, 445 P.2d 624 (1968). *Waiver is not absolute, however, but is limited to medical information relevant to the litigation. See* CR 26(b)(1).
>
> The danger of an ex parte interview is that it may result in disclosure of irrelevant, privileged medical information. . . . The plaintiff's interest in avoiding such disclosure can best be protected by allowing plaintiff's counsel an opportunity to participate in physician interviews and raise appropriate objections.

*Loudon*, 110 Wn.2d at 677-78 (emphasis added) (footnote omitted). By protecting against the disclosure of information irrelevant to the litigation, the *Loudon* rule furthers a primary purpose of the patient privilege statute—protecting patient confidentiality—even though the plaintiff has waived the absolute privilege from discovery about relevant matters. As this court put it in a postamendment case, "*Loudon* . . . held that a plaintiff-patient's *waiver* of the physician-patient privilege *does not authorize ex parte communications between the defendant and the plaintiff's treating physicians.*" *Carson v. Fine*, 123 Wn.2d 206, 210-11, 867 P.2d 610 (1994) (emphasis added). That rule remains as valid today, now that such waiver is codified by statute, as it was when *Loudon* was decided.

14

The existence of preamendment waiver is sufficient by itself to show that *Loudon* remains good law. But it should also be noted that *Loudon* rests on more than just the patient's confidentiality interest. In addition to furthering that interest, the *Loudon* rule serves three distinct functions. First, it protects the doctor-patient fiduciary relationship:

> The relationship between physician and patient is a "fiduciary one of the highest degree . . . involv[ing] every element of trust, confidence, and good faith." *Lockett v. Goodill*, 71 Wn.2d 654, 656, 430 P.2d 589 (1967). . . . "[W]e find it difficult to believe that a physician can engage in *ex parte* conference with the legal adversary of his patient without endangering the trust and faith invested in him by his patient."

*Loudon*, 110 Wn.2d at 679 (alterations in original) (footnote omitted) (citing *Petrillo v. Syntex Labs., Inc.*, 148 Ill. App. 3d 581, 595, 499 N.E.2d 952, 102 Ill. Dec. 172 (1986)). Second, it protects the physician's "interest in avoiding inadvertent wrongful disclosures," which the court "recognize[d], without deciding," might trigger the physician's liability to the patient. *Id.* at 680. Finally, it aids in proper trial administration, preventing the occasion from arising where defense counsel might be called to testify as an impeachment witness. *Id.*[6]

---

[6] Three years ago, in *Smith v. Orthopedics International, Ltd.*, 170 Wn.2d 659, 666-67, 244 P.3d 939 (2010), this court reaffirmed all of *Loudon*'s policy holdings and also emphasized the special problems that ex parte contacts pose in personal injury and medical malpractice cases. Citing reasoning in cases from other jurisdictions, the *Smith* court noted that in personal injury cases, ex parte contacts might provide defense counsel the opportunity to surprise the plaintiff with information furnished by his treating physician,

In sum, *Loudon* clearly establishes a patient-plaintiff's right to supervise his nonparty physician's communications with opposing counsel. *Loudon* was a unanimous decision, which has remained in force for 25 years, and will not be abandoned absent "a clear showing that [it] is incorrect and harmful." *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970). No such showing has been made here. Amendments to the patient privilege statute have not diminished *Loudon*'s relevance; it remains binding precedent.

2. The *Upjohn* privilege survives *Loudon*, but we limit and clarify the scope of that corporate attorney-client privilege in the *Loudon* context

The defendants contend that the corporate attorney-client privilege guarantees their right to communicate ex parte with any of their employees, regardless of the *Loudon* rule. For the reasons given below, we reject the defendants' application of the corporate attorney-client privilege in this context but hold that *Loudon* must yield where it would infringe on the privilege as properly construed.

---

while in medical malpractice cases they might draw the nonparty physician into discussions about the overall merit of malpractice suits. *Smith*, 170 Wn.2d 669 n.2. (citing *Law v. Zuckerman*, 307 F. Supp. 2d 705, 711 (D. Md. 2004); *Manion v. N.P.W. Med. Ctr. of N.E. Pa., Inc.*, 676 F. Supp. 585, 594-95 (M.D. Pa.1987)). While there were three opinions in *Smith*, the court was unanimous that the *Loudon* rule barred not only ex parte interviews with a plaintiff's nonparty physician, but also any ex parte "contacts" with that physician whatsoever. *Id.* at 670.

16

In *Upjohn,* 449 U.S. at 386, the United States Supreme Court held that corporations, like individuals, enjoy the protections of the attorney-client privilege. It also discussed the privilege's scope. *Id.* at 391-97. It overruled prior precedent limiting the privilege to counsel's communications with the corporate "control group"—upper-level management—and held that the privilege can extend to communications with certain other employees as well. *Id.*

The defendants maintain that *Upjohn* recognized a blanket privilege for communications between corporate counsel and corporate employees at all levels, regardless of a given employee's relationship to potential corporate liability. This perspective—which in the era of rapidly consolidating healthcare systems would all but eviscerate *Loudon*—reads too much into the *Upjohn* decision. *Upjohn* does not say that every corporate employee is necessarily a "party" to a lawsuit naming the employee's corporate employer. *Cf. Wright,* 103 Wn.2d at 202 ("A corporate employee who is a 'client' under the attorney-client privilege is not necessarily a 'party' for [other] purposes . . . ."). Nor does it say that every employee is corporate counsel's "client." The question in *Upjohn* was whether attorney-client privilege could *ever* apply to corporate counsel's communications with nonmanagerial employees. *Upjohn,* 449 U.S. at 389. The Court said the answer is yes, largely

because "protect[ion] against compelled disclosure . . . [was c]onsistent with the underlying purposes of the attorney-client privilege." *Id.* at 395.

The *Upjohn* Court also explained these purposes; it stated that the attorney-client privilege "'facilitates the full development of facts essential to proper representation of the client [and] . . . encourages laymen to seek early legal assistance.'" *Id.* at 391 (quoting MODEL CODE OF PROF'L RESPONSIBILITY EC 4-1). The Court determined that to serve these purposes effectively in a corporate context, the attorney-client privilege could not be limited to corporate counsel's communications with high-level employees. If the privilege were so limited, the Court reasoned, counsel would face a "'"Hobson's choice"'" between engaging in potentially incriminating communications with low-level employees, on the one hand, and foregoing access to the information those employees might provide, on the other. *Id.* (citing *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 608 (8th Cir. 1978)). The Court noted that in the context of corporate liability, low- and mid-level employees might well be the only source of information relevant to legal advice, since they can, "by actions within the scope of their employment, embroil the corporation in serious legal difficulties." *Id.* Without talking to these employees, the Court reasoned, corporate counsel "may find it extremely difficult, if not

18

impossible, to determine what happened" to trigger potential corporate liability. *Id.* at 392 (quoting *Diversified Indus.*, 572 F.2d at 608-09).

We adopt this reasoning from *Upjohn*. In previous cases, this court has endorsed *Upjohn*'s "flexible . . . test," praising it for furthering the "laudable goals of the attorney-client privilege." *Wright*, 103 Wn.2d at 201-02; *see also Sherman v. State*, 128 Wn.2d 164, 190, 905 P.2d 355 (1995) (citing *Upjohn* for the principle that "correspondence between an attorney for a corporate entity and that entity's employees [may be] subject to the attorney-client privilege of the corporate entity").

In this case, however, *Upjohn* and *Loudon* conflict. *Loudon* and *Upjohn* do address different types of communication—the *Upjohn* plaintiffs sought access to records of past communications, while the *Loudon* plaintiffs sought to supervise future interviews—but both cases implicate the same fundamental questions of attorney-client privilege. The privilege established in *Upjohn*, protecting certain communications from after-the-fact discovery, implies a corresponding privilege from contemporaneous supervision by opposing counsel. Therefore, certain ex parte communications between a hospital's corporate defense counsel and hospital employees may be protected by *Upjohn* but barred by *Loudon*. Indeed, depriving counsel of the ability to communicate confidentially with a client damages the privilege just as much as disclosing a prior communication does. *Cf. Geders v.*

19

*United States*, 425 U.S. 80, 88-91, 96 S. Ct. 1330, 47 L. Ed. 2d 592 (1976) (barring communications between defense counsel and criminal defendant during overnight trial recess violates Sixth Amendment right to counsel).

We rely upon *Upjohn*'s reasoning to resolve this conflict. The attorney-client privilege is "'the oldest of the privileges for confidential communications known to the common law,'" and it "'promote[s] broad[] public interests in the observance of law and administration of justice.'" *United States v. Jicarilla Apache Nation*, ___ U.S. ___, 131 S. Ct. 2313, 2320, 180 L. Ed. 2d 187 (2011) (quoting *Upjohn*, 449 U.S. at 389). In keeping with those interests, the *Upjohn* Court rejected the narrow "control group" test for corporate attorney-client privilege because that test "makes it difficult for corporate attorneys to formulate sound advice . . . [and] threatens to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law." *Upjohn*, 449 U.S. at 392.

But the *Upjohn* Court did not articulate a fixed set of criteria by which to determine what specific conversations with lower-level employees must remain privileged in order to protect those values. Although the Court identified specific factors as relevant to its decision in that case,[7] it expressly "decline[d] to lay down a

---

[7] In finding the communications at issue in *Upjohn* to be privileged, the Court noted that (1) they were made at the direction of corporate superiors, (2) they were made by corporate employees, (3) they were made to corporate counsel acting as such, (4) they

broad rule . . . to govern all conceivable future questions [of corporate attorney-client privilege]." *Id.* at 386, 394. Still, *Upjohn*'s reasoning implies a limiting principle. This principle follows from *Upjohn*'s central policy concern, which is to facilitate frank communication about alleged wrongdoing. The *Upjohn* Court sought to protect counsel's ability to "ascertain the factual background" of a "legal problem," and it rejected the narrow "control group" test because that test would frustrate the lawyer's *investigative* abilities. *Id.* at 390 ("[The control group test] overlooks the fact that the privilege exists to protect not only the giving of professional advice to those who can act on it, *but also the giving of information to the lawyer to enable him to give sound and informed advice.*" (emphasis added)). In keeping with these goals, we hold that the corporate attorney-client privilege trumps the *Loudon* rule where an ex parte interview enables corporate counsel "'to determine what happened'" to trigger the litigation. *Upjohn*, 449 U.S. at 392 (internal quotation marks omitted) (quoting *Diversified Indus.*, 527 F.2d at 608-09). Under this rule, corporate defense counsel may have privileged ex parte communications with a

---

concerned matters within the scope of the employee's duties, (5) they revealed factual information "not available from upper-echelon management," (6) they revealed factual information necessary "to supply a basis for legal advice," (7) the communicating employee was sufficiently aware that he was being interviewed for legal purposes, and (8) the communicating employee was sufficiently aware that the information would be kept confidential. *Upjohn*, 449 U.S. at 394.

plaintiff's nonparty treating physician only where the communication meets the general prerequisites to application of the attorney-client privilege,[8] the communication is with a physician who has direct knowledge of the event or events triggering the litigation, and the communications concern *the facts of the alleged negligent incident.* The *Loudon* rule still bars ex parte interviews as to information about prior and subsequent treatment (i.e., information about the plaintiff's particular vulnerabilities or the nature of the plaintiff's recovery or disabilities). This rule strikes the proper balance between the attorney-client and physician-patient privileges, limiting *Loudon*'s prophylactic protections to the extent necessary to protect a corporate defendant's right to fully investigate its potential liability.

Finally, in concluding our discussion of the conflict between *Loudon* and *Upjohn*, we make two points. First, we reiterate that the attorney-client privilege protects communications, but not the facts underlying those communications. *Wright,* 103 Wn.2d at 195 (citing *Upjohn*, 449 U.S. at 395-96). Second, we acknowledge that the communications actually at issue in *Upjohn* were written questionnaires and thus distinguishable from ex parte *interviews* in certain respects. But, in the context of the *Loudon* rule, this court has refused to distinguish between

---

[8] *See supra* note 4.

limited, written communications and unlimited ex parte interviews. *Smith v. Orthopedics Intern., Ltd.*, 170 Wn.2d 659, 665-70, 224 P.3d 939 (2010). Rehabilitating that distinction here would erode rather than strengthen the *Loudon* rule, and the limit it would impose on a hospital's attorney-client privilege is unrelated to any of the policy concerns articulated in *Upjohn*.

### 3. Hospital Regulatory Law

The defendants also argue that hospital regulatory statutes give them the right to communicate ex parte with any of their employees at any time. They cite Washington's Uniform Health Care Information Act (UHCIA), chapter 70.02 RCW, and Washington's hospital quality improvement (QI) statute, RCW 70.41.200.[9] The UHCIA authorizes the disclosure of confidential patient information "to the extent a recipient needs to know the information, if the disclosure is . . . to [a] person who requires [the] information . . . to provide . . . quality assurance . . . or . . . legal . . . services to . . . the health care provider or health care facility . . . ." RCW

---

[9] The defendants also cite the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA), which allows disclosure of confidential health care information under certain circumstances. In general, HIPAA supersedes contrary state law, but it does not do so where "the provision of State law . . . relates to the privacy of individually identifiable health information." 42 U.S.C. § 1320d-7(a)(2)(B). HIPAA cannot authorize disclosures prohibited under Washington law. Therefore, to determine whether *Loudon* applies to the cases at hand, we need not consider arguments related to HIPAA.

70.02.050(1)(b).[10]   The QI statute requires that hospitals collect information concerning their patients' "negative health care outcomes" and protects this information from civil discovery.   RCW 70.41.200(1)(e), (3).[11]   The defendants

———

[10] The full text of RCW 70.02.050(1)(b) authorizes disclosures of confidential medical information:

> To any other person who requires health care information for health care education, or to provide planning, quality assurance peer review, or administrative, legal, financial, actuarial services to, or other health care operations for or on behalf of the health care provider or health care facility; or for assisting the health care provider or health care facility in the delivery of health care and the health care provider reasonably believes that the person:
>
> (i)    Will not use or disclose the health care information for any other purpose; and
>
> (ii)   Will take appropriate steps to protect the health care information.

[11] The full text of RCW 70.41.200(1) provides:

> Every hospital shall maintain a coordinated quality improvement program for the improvement of the quality of health care services rendered to patients and the identification and prevention of medical malpractice. The program shall include at least the following:
>
> . . . .
>
>      (e) The maintenance and continuous collection of information concerning the hospital's experience with negative health care outcomes and incidents injurious to patients including health care-associated infections as defined in RCW 43.70.056, patient grievances, professional liability premiums, settlements, awards, costs incurred by the hospital for patient injury prevention, and safety improvement activities.

RCW 70.41.200(3) provides:

24

argue that both statutes preclude the application of the *Loudon* rule to a defendant

hospital's employees.

With respect to the QI regime, the defendants cite *Burger v. Lutheran General*

*Hospital*, 198 Ill. 2d 21, 759 N.E.2d 533, 259 Ill. Dec. 753 (2001), a case in which

the Illinois Supreme Court upheld a hospital licensing statute authorizing unlimited

intrahospital communications, in contravention of Illinois's *Loudon*-equivalent, the

---

Information and documents, including complaints and incident reports, created specifically for, and collected and maintained by, a quality improvement committee are not subject to review or disclosure, except as provided in this section, or discovery or introduction into evidence in any civil action, and no person who was in attendance at a meeting of such committee or who participated in the creation, collection, or maintenance of information or documents specifically for the committee shall be permitted or required to testify in any civil action as to the content of such proceedings or the documents and information prepared specifically for the committee. This subsection does not preclude: (a) in any civil action, the discovery of the identity of persons involved in the medical care that is the basis of the civil action whose involvement was independent of any quality improvement activity; (b) in any civil action, the testimony of any person concerning the facts which form the basis for the institution of such proceedings of which the person had personal knowledge acquired independently of such proceedings; (c) in any civil action by a health care provider regarding the restriction or revocation of that individual's clinical or staff privileges, introduction into evidence [of] information collected and maintained by quality improvement committees regarding such health care provider; (d) in any civil action, disclosure of the fact that staff privileges were terminated or restricted, including the specific restrictions imposed, if any and the reasons for the restrictions; or (e) in any civil action, discovery and introduction into evidence of the patient's medical records required by regulation of the department of health to be made regarding the care and treatment received.

25

*Petrillo* doctrine. The statute at issue in *Burger* permitted communication "'at any time and in any fashion,'" between a hospital's medical staff and legal counsel "'concerning . . . any care or treatment they provided or assisted in providing to any patient within the scope of their employment or affiliation with the hospital.'" *Burger*, 198 Ill. 2d at 26 (quoting 210 ILL. COMP. STAT. 85/6.17(e)).[12] The Illinois Supreme Court concluded that subordinating the licensing statute to the *Petrillo* doctrine "would lead to absurd results":

---

[12] The full text of the provisions alleged to violate patient privacy under the *Petrillo* doctrine states:

"(d) No member of a hospital's medical staff and no agent or employee of a hospital shall disclose the nature or details of services provided to patients, except that the information may be disclosed to the patient, persons authorized by the patient, the party making treatment decisions, if the patient is incapable of making decisions regarding the health services provided, those parties directly involved with providing treatment to the patient or processing the payment for that treatment, those parties responsible for peer review, utilization review, quality assurance, risk management or defense of claims brought against the hospital arising out of the care, and those parties required to be notified under the Abused and Neglected Child Reporting Act, the Illinois Sexually Transmissible Disease Control Act, or where otherwise authorized or required by law."

"(e) The hospital's medical staff members and the hospital's agents and employees may communicate, at any time and in any fashion, with legal counsel for the hospital concerning the patient medical record privacy and retention requirements of this section and any care or treatment they provided or assisted in providing to any patient within the scope of their employment or affiliation with the hospital."

*Burger*, 198 Ill. 2d at 26 (quoting 210 ILL. COMP. STAT. 85/6.17 (West 2000)).

26

> [I]f *Petrillo* prevented the limited intrahospital communications authorized by subsections (d) and (e) of section 6.17 of the Act, hospitals would face the dilemma of having to choose between ceasing to communicate with all hospital caregivers with respect to a hospital patient's treatment, communicating only with those caregivers the hospital assumes were not negligent and risk a subsequent *Petrillo* violation if the hospital's assumption was incorrect, or deposing all of the patient's hospital caregivers. Further, if we were to accept plaintiff's view, hospitals, which are statutorily obligated to create, maintain and protect private medical records, would be forced to subpoena their own records in the event of litigation.

*Burger*, 198 Ill. 2d at 58-59.

We do not accept defendants' invitation to adopt the reasoning in *Burger*. Washington's QI statute does not contain the Illinois statute's strong language, permitting hospital employees to communicate "'at any time and in any fashion'" with hospital counsel. *Id.* at 26 (quoting 210 ILL. COMP. STAT. 85/6.17(e)). Thus, to the extent that *Burger* simply interprets a statute, it is not directly relevant here. To the extent the defendants argue that *Loudon* is unworkable in the context of their QI obligations, this case is not the proper venue in which to address that policy argument. The plaintiffs and amicus WSAJF contend that litigation defense counsel can be screened from the QI committee and the record does not contain any information suggesting that such screening is unworkable. On the contrary, the *Loudon* rule and the QI regime have coexisted, apparently successfully, for over 25 years.

The QI statute precludes restrictions on communications between a hospital's QI committee and its physicians, but the committee members can be screened from defense counsel in a malpractice action. Such screening will preserve *Loudon*'s protections for patient-plaintiffs, while also allowing hospitals to meet statutory requirements for quality improvement. This screening preserves the integrity of the QI process, allowing the QI committee to meet its statutory requirement to collect and maintain information "specifically for" QI purposes. *See* WSAJF Br. at 24-25.

With respect to the UHCIA, the defendants' argument can be summed up as follows: the statute allows physicians and hospitals to disclose patients' confidential medical information where necessary to obtain legal services; when a hospital is sued for the conduct of *one* of its employees, it needs to be able to get information from *any* of its employees, in order to properly prepare for litigation (i.e., to obtain "legal services" under RCW 70.02.050(1)(b)). The plaintiffs counter that there is no conflict between the UHCIA and *Loudon*, because a hospital can obtain "legal services" without violating the physician-patient privilege. We agree: that is precisely what the *Loudon* rule was designed to facilitate.

The defendants cite cases from Arizona and Florida, where courts have held that a hospital's employer status trumps those states' *Loudon*-equivalents. Florida's District Court of Appeal found that intrahospital communications were not

28

"disclosures" for purposes of the state's patient privilege statute. *Estate of Stephens ex rel. Clark v. Galen Health Care Inc.*, 911 So. 2d 277, 282 (Fla. Dist. Ct. App. 2005). An Arizona appellate court reasoned that a hospital's right to engage in ex parte communications with its own employees "exists because the employment relationship exists" and could not be diminished by the filing of a lawsuit. *Phoenix Children's Hosp., Inc. v. Grant*, 228 Ariz. 235, 239, 265 P.3d 417 (Ct. App. 2011).

Neither the Florida nor the Arizona authority is persuasive. Both courts essentially concluded that corporate employers have a right to communicate ex parte with their employees, simply by virtue of the employer-employee relationship. The Arizona court derived that holding from the "'well established rule in the law of agency that a corporation is bound by the knowledge acquired by . . . its agents or officers which is within the scope of their authority and . . . in reference to a matter to which their authority extends.'" *Grant*, 228 Ariz. at 239 (quoting *Fridena v. Evans*, 127 Ariz. 516, 519, 622 P.2d 463 (1980) and citing *Samaritan Found. v. Goodfarb*, 176 Ariz. 497, 503, 862 P.2d 870 (1993)). Similarly, the Florida court reasoned that a hospital must

> be[] able to speak to its agents and employees . . . because the hospital
> . . . can function only through its employees and agents, and its
> "knowledge" of information like how its standards for nurse training
> and patient care are being carried out depends solely on information
> acquired and reported by its agents and employees.

*Clark*, 911 So. 2d at 281. Neither a principle of imputed knowledge, nor the self-evident fact that corporations consist of people, should affect the application of a *Loudon*-type rule. *Loudon* does not prohibit the acquisition of knowledge; it merely imposes procedural safeguards to prevent improper influence or disclosures. Moreover, at the conclusion of its opinion, the Arizona court hypothesized some limits on a corporate defendant's right to communicate ex parte with its employees, which were not at issue in the case before it. These included court-imposed rules to prevent the disclosure of irrelevant privileged information or to block communications with "different employees or departments of a hospital . . . ." *Grant*, 228 Ariz. at 240. Such limits are among those that our modified *Loudon* rule imposes on the defendants here.

## CONCLUSION

*Loudon* survives the amendments to the patient privilege statute. It remains good law, and it applies where the defendant employs the plaintiff's nonparty treating physician. If *Loudon* conflicts with a defendant's corporate attorney-client privilege, however, it must yield to that privilege. This means that an attorney hired by a corporate defendant to investigate or litigate an alleged negligent event may engage in privileged (ex parte) communications with the corporation's physician-

employee where the physician-employee has firsthand knowledge of the alleged negligent event and where the communications are limited to the facts of the alleged negligent event. We emphasize that "the facts of the alleged negligent incident" do not encompass health care that was provided before or after the event triggering the litigation, such as care for preexisting conditions or postevent recovery. This is true even where such care bears on the issue of damages.

We remand these cases to the trial courts for further proceedings consistent with this opinion. Because the trial courts' orders differed from one another in key respects, we address each order separately.

In Ms. Glover's case, the trial court issued a protective order stating that "Defense Counsel and the defendant's risk manager are prohibited from ex parte contact, directly or indirectly, with any of Plaintiff Aolani Glover's treating physicians at University of Washington Medical Center." CP at 170. We affirm the portion of the trial court's order prohibiting defense counsel from having ex parte contact with Ms. Glover's treating UWMC physicians. Because these physicians were not present when the alleged negligent incident occurred at Harborview, they are covered by the *Loudon* rule. We reverse that portion of the trial court's order barring the risk manager from having ex parte contact with UWMC physicians, and

we remand the trial court to require that the risk manager be screened from the defense in this case.

In Mr. Youngs' case, the trial court ruled that "counsel for PeaceHealth may have ex parte contact with PeaceHealth employees who provided health care to plaintiff Marc Youngs." CP at 9. We affirm the portion of the trial court's order permitting defense counsel's ex parte communications with Mr. Youngs' nonparty treating physicians, but only as to those physicians who have firsthand knowledge of the alleged negligent incident and only as to communications about the facts of that incident. We reverse the portion of that order permitting ex parte communications with Mr. Youngs' other nonparty treating physicians (those lacking firsthand knowledge of the alleged negligent incident) and with any of Mr. Youngs' nonparty treating physicians on topics other than the facts of the alleged negligent incident.

_Gordon McCloud, J._

WE CONCUR:

_Madsen, C.J._

_J.M. Johnson_

_Owens, J._

_Wiggins, J._

No. 87811-1

STEPHENS, J. (concurring in part/dissenting in part)—The majority fashions a new rule that allows "an attorney hired by a corporate defendant to investigate or litigate an alleged negligent event [to] engage in privileged (ex parte) communications with the corporation's physician-employee where the physician-employee has firsthand knowledge of the alleged negligent event and where the communications are limited to the facts of the alleged negligent event." Majority at 30-31. This rule is wholly unworkable. Moreover, it erodes the sound policy decision made by this court in *Loudon v. Mhyre*, 110 Wn.2d 675, 756 P.2d 138 (1988), without justification rooted in either the employer-employee relationship or the attorney-client privilege.

I would hew to our decision in *Loudon*, recognizing that the risks we were concerned with there exist equally in the context of a medical malpractice action against a corporate defendant. The majority properly recognizes that the *Loudon*

rule is unaffected by changes in the statutory physician-patient privilege, RCW 5.60.060(4)(b), and coexists with Washington's Uniform Health Care Information Act (UHCIA), chapter 70.02 RCW, and Washington's hospital quality improvement statute (QI statute), RCW 70.41.200.[1] Majority at 13, 27-28. It goes astray, however, by seizing on *Upjohn Co. v. United States,* 449 U.S. 383, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981), as requiring allowance for ex parte contact between corporate defense counsel and the plaintiff's nonparty treating physicians employed by the corporation. For the reasons explained below, I concur in part and dissent in part from the majority's resolution of these cases.

## DISCUSSION

This court in *Loudon* adopted a bright-line rule prohibiting defense counsel from engaging in ex parte contact with the plaintiff's nonparty treating physicians. 110 Wn.2d at 682; *Smith v. Orthopedics Int'l, Ltd.,* 170 Wn.2d 659, 670, 244 P.3d 939 (2010) (lead opinion). As the majority recognizes, this rule serves several important goals: it safeguards the plaintiff's confidentiality interest in not having irrelevant personal health care information disclosed; it protects the physician-patient fiduciary relationship and serves the physician's interest in avoiding inadvertent disclosures that might give rise to liability to the patient; and it serves the administration of justice, avoiding the risk that defense counsel may become an impeachment witness. Majority at 14-15. In the context of medical malpractice

---

[1] I also agree with the majority that the federal Health Insurance Portability and Accountability Act of 1996 has no bearing on this case. Majority at 23 n.9.

litigation, the *Loudon* rule is particularly important to avoid the risk that the plaintiff's health care providers might be unduly "shaped and influenced by" ex parte contact or "improperly assume a role akin to that of an expert witness for the defense." *Smith*, 170 Wn.2d at 668 (lead opinion). Discussing these risks, the lead opinion in *Smith* quoted favorably from *State ex rel. Woytus v. Ryan*, 776 S.W.2d 389, 395 (Mo. 1989), "acknowledging that ex parte contact in medical malpractice cases between defense counsel and a nonparty treating physician creates risks that are not generally present in other types of personal injury litigation, including the risk of discussing "'the impact of a jury's award upon a physician's professional reputation, the rising cost of malpractice insurance premiums, [and] the notion that the treating physician might be the next person to be sued,'" among others." 170 Wn.2d at 669 n.2 (lead opinion) (alteration in original) (internal quotation marks omitted).

Tracing the history of Washington's rule since *Loudon*, the majority correctly rejects the argument that the prohibition on ex parte contact rests on the physician-patient privilege and is thus no longer good law after statutory amendments to the privilege created a blanket waiver. Majority at 12-14; *see Smith*, 170 Wn.2d at 665 (lead opinion), 674 (Fairhurst, J., concurring). This was clear from the instant the issue was stated in *Loudon*. 110 Wn.2d at 675-76 ("The issue presented is whether defense counsel in a personal injury action may communicate ex parte with the plaintiff's treating physicians *when the plaintiff has waived the physician—patient privilege.*" (emphasis added)).

The majority also correctly rejects the argument that the *Loudon* rule is incompatible with statutes governing disclosure of personal health care information and protecting information gathered during internal quality improvement reviews. Neither the UHCIA nor the QI statute erodes the policy of *Loudon*. As the majority observes, "the *Loudon* rule and the QI regime have coexisted, apparently successfully, for over 25 years." Majority at 27. It is certainly possible to segregate litigation activity and quality improvement activity. Indeed, our recent decision in *Lowy v. PeaceHealth*, 174 Wn.2d 769, 778, 280 P.3d 1078 (2012), underscores that the quality improvement statutes are not to be used as a shield to alter the balance of interests of either party in litigation.

While the majority recognizes the wisdom and continued vitality of the *Loudon* rule as against these arguments, it loses its way, in my view, when it posits a clash between the *Loudon* rule and the attorney-client privilege. The majority maintains that a "modified version of the *Upjohn* test" is needed in the context of corporate medicine to balance the values underlying the physician-patient privilege and the attorney-client privilege. Majority at 5. Thus, it crafts a rule that turns a case about a corporate defendant's right to shield from disclosure internal employee questionnaires (*Upjohn*) into an entitlement to interview, ex parte, an opposing party's treating physician. Ironically, it allows ex parte contact only as to facts concerning "the alleged negligent event," *id.* at 31, which are equally available to both parties. How this rule will play out in practice is hard to describe. Apparently, both defense counsel and plaintiff's counsel can interview the employee physician

-4-

ex parte, since the majority would recognize that *Wright v. Group Health Hospital*, 103 Wn.2d 192, 691 P.2d 564 (1984), governs plaintiff's counsel's contact with the physician. Majority at 6. But, the corporate defendant can claim attorney-client privilege as to what the plaintiff's physician tells defense counsel, so the physician cannot relate to the patient what has been disclosed to a litigation adversary about the patient's health care. Moreover, the employer's right to interview the employee seems to be unaffected by whether the employee physician shares the attorney-client relationship between the employer and its counsel.

This last point is critical. Though the majority acknowledges that a corporate employee is not necessarily a party or even corporate counsel's client, *see id.* at 17, it ultimately concludes *Loudon* must yield to *Upjohn* because the protection of privileged communications implies a "corresponding privilege" to conduct ex parte communications. *Id.* at 19. For support, the majority cites only a criminal case involving a traditional attorney-client relationship, which is quite different from *Upjohn*, involving after-the-fact treatment of privileged documents created in a corporate setting. *Id.* at 19-20 (citing *Geders v. United States*, 425 U.S. 80, 88-91, 96 S. Ct. 1330, 47 L. Ed. 2d 592 (1976)). The lack of supporting authority underscores that the implication the majority derives from *Upjohn* is not supportable. While the attorney-client privilege encompasses past communications between corporate defense counsel and corporate employees, this does not translate into a right of defense counsel to engage in ex parte communications with all employees once litigation commences. Corporate defense counsel represents the defendant

corporation, not its employees. Indeed, counsel cannot corepresent an employer and employee if the duty to one client would be materially limited by the duty to the other. RPC 1.13(g) (referencing RPC 1.7). Potentially conflicting obligations are unavoidable in a medical malpractice action where a nonparty treating physician is both an employee of the defendant and a fiduciary of the plaintiff. If nothing else, the physician needs guidance on what questions she can answer consistent with her fiduciary duty to her patient and whether she can discuss her answers with her patient or the patient's counsel. The situation is so rife with potential conflicts that courts have recognized the need for corporate counsel to give so-called "*Upjohn* warnings," also known as "corporate *Miranda*[2] warnings," before questioning employees, to advise them that the corporation is the client and controls waiver of any attorney-client privilege and that the employee may need to obtain independent counsel. *See United States v. Ruehle*, 583 F.3d 600, 604 n.3 (9th Cir. 2009); RPC 1.13(f) & cmt. 10. Of course, if the employee retains independent counsel, RPC 4.2 prohibits ex parte contact by corporate defense counsel regardless of the employer-employee relationship.

To underscore why the attorney-client privilege at issue in *Upjohn* does not "trump[] the *Loudon* rule" as the majority maintains, majority at 21, consider another situation in which the employee is not a client or a defendant party, but is the *plaintiff* bringing suit. Even in a medical malpractice context, a plaintiff may also be an employee of the defendant corporation. This was the situation in *Lowy*, and is

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

increasingly common in this era of large health care organizations that require employees to receive services inside their system. *See* 174 Wn.2d at 772 (plaintiff Dr. Leasa Lowy was the staff physician at the hospital where she was admitted as patient). The same arguments supporting the corporation's ability to assert attorney-client privilege over communications between defense counsel and employees would apply in this context to communications between defense counsel and the plaintiff-employee. But, no one would suggest that the existence of the attorney-client privilege somehow implies defense counsel's right to interview the plaintiff ex parte. This is because the rules limiting ex parte contact do not turn on the existence or nonexistence of any evidentiary privilege.

Instead, these rules reflect practical distinctions and policy considerations. Not *Upjohn*, but *Loudon* and *Wright* provide the proper point of reference. These cases, specific to the litigation context, recognize the distinction between parties and nonparties and the competing interests of litigation opponents with respect to certain nonparty witnesses. *Loudon* teaches that a nonparty witness who is the plaintiff's physician cannot be treated the same as any other nonparty witness, whom either party may freely contact. 110 Wn.2d at 681 ("The unique nature of the physician—patient relationship and the dangers which ex parte interviews pose justify the direct involvement of counsel in any contact between defense counsel and a plaintiff's physician."). Similarly, *Wright* recognizes that corporate employees authorized to speak for or otherwise bind the corporation are considered "parties" with whom opposing counsel cannot have ex parte contact. 103 Wn.2d at 195-202. Other

employees outside this "control group" are nonparty witnesses who may be interviewed by opposing counsel. *Id.* Importantly, the court in *Wright* rejected an argument based on *Upjohn* that the attorney-client privilege requires restricting the ability of opposing counsel to speak with all employees, emphasizing that the policies defining the scope of the privilege differ from those defining when ex parte contact should be allowed. *Id.* at 201-02. Subsequently, the court in *Loudon* distinguished *Wright*, emphasizing that policy concerns specific to the physician-patient relationship required limiting *Wright*'s rule allowing ex parte contact with nonparty witnesses. 110 Wn.2d at 681.

The question in this case, then, is whether the lines that this court has drawn must be erased simply because the nonparty treating physician is employed by the defendant health care entity. It is difficult to see how the physician in this corporate setting is less connected with her patient's interest as to require a different rule. To the contrary, just as the lead opinion in *Smith* recognized the heightened risks of ex parte contact in the medical malpractice context, 170 Wn.2d at 669 & n.2 (lead opinion), we should be especially concerned that a physician's duty to a patient may be compromised when the contact is initiated by the physician's employer's counsel. The risk that the physician's testimony may be "shaped and influenced," *id.* at 668 (lead opinion), is perhaps at its highest in this context.

The majority's self-imposed limitation on the ex parte contact it authorizes offers faint protection against this risk. Under the majority's rule, a plaintiff can do nothing but blindly trust that opposing counsel and her physician will discuss only

"the facts of the alleged negligent event." Majority at 31. The court in *Loudon* was skeptical, recognizing the inherent danger that ex parte contact would result in irreparable harm from the improper disclosure of irrelevant, privileged information. *See* 110 Wn.2d at 678 (admitting "'[w]e are concerned . . . with the difficulty of determining whether a particular piece of information is relevant'" (quoting *Roosevelt Hotel Ltd. P'ship v. Sweeney*, 394 N.W.2d 353, 357 (Iowa 1986))). Additionally, we recognized that "[t]he harm from disclosure of this confidential information cannot . . . be fully remedied by subsequent court sanctions." *Id.* The majority seems to brush aside these concerns in formulating a rule that requires physicians and defense attorneys to determine what constitutes "facts of the alleged negligent incident." Majority at 32.

The majority's rule not only subjects the physician-plaintiff relationship to the inherent dangers of inadvertent disclosure but prevents the plaintiff from inquiring about any such disclosures under the cloak of attorney-client privilege. *See* RCW 5.60.060(2)(a) (prohibiting examination of attorney regarding attorney-client communication); *State v. Ingels*, 4 Wn.2d 676, 712, 104 P.2d 944 (1940) (extending statutory prohibition against examination to client). This is clearly not what we intended in *Loudon* when we sought to "protect[] the sanctity" of the physician-patient relationship, to recognize that "'[t]he relationship between physician and patient is "a fiduciary one of the highest degree . . . involv[ing] every element of trust, confidence and good faith,"'" "to 'surround patient-physician communications with a "cloak of confidentiality"' to promote proper treatment by facilitating full

disclosure of information,'" and "'to protect the patient from embarrassment or scandal which may result from revelation of intimate details of medical treatment.'" *Smith*, 170 Wn.2d at 667 (quoting *Loudon*, 110 Wn.2d at 679 (alterations in original) (quoting *Lockett v. Goodwill*, 71 Wn.2d 654, 656, 430 P.2d 589 (1967))), and (quoting *Carson v. Fine*, 123 Wn.2d 206, 213, 867 P.2d 610 (1994) (lead opinion) (quoting *Dep't of Soc. & Health Servs. v. Latta*, 92 Wn.2d 812, 819, 601 P.2d 520 (1979))). The majority's new rule undermines these goals.

Even worse, many plaintiff-patients have no realistic opportunity to arrange for their health care outside the corporate setting in a manner that avoids the risks of the majority's rule. In an age of large health maintenance organizations (HMOs), the physician-patient relationship is increasingly intertwined with the employer-employee relationship, and thus vulnerable to employer encroachment. HMOs generally require their members to use their doctors and facilities; going elsewhere and paying out-of-pocket is not an option for most. It is no longer a rare instance that a defendant healthcare provider is the employer of a plaintiff's physicians, past or present. As illustrated by *Lowy*, even the plaintiff may be an employee. The need to protect the integrity of the physician-patient relationship should be of even greater concern now than 25 years ago.

While the majority's rule imposes new burdens on plaintiff-patients, applying the *Loudon* rule in the corporate medicine context does not unduly limit the ability of the defendant corporations to protect their interests. *Loudon* does not restrict the sort of internal, prelitigation investigations that produced the attorney-client

privileged documents at issue in *Upjohn*. Quality improvement committees are still able to collect confidential patient information in order to assess legal risks and areas of improvement, in compliance with RCW 70.41.200(1)(e), so long as QI team members are later screened from litigation and that information is protected from civil discovery. Moreover, a corporate defendant remains free to engage in privileged communications with its employees other than the plaintiff or the plaintiff's nonparty treating physicians, before and throughout litigation. *Loudon* does not prevent hospitals from obtaining legal services in compliance with RCW 70.02.050(1)(b). Even as to the plaintiff's nonparty treating physicians, the information defense counsel seeks can be obtained through medical records, depositions by examination or written questions, and informal interviews with both counsel present. *Loudon*, 110 Wn.2d at 680. As the majority recognizes, "*Loudon* does not prohibit the acquisition of knowledge; it merely imposes procedural safeguards to prevent improper influence or disclosures." Majority at 30. For good reason, the court in *Loudon* was "unconvinced that any hardship caused the defendants by having to use formal discovery procedures outweighs the potential risks involved with ex parte interviews." 110 Wn.2d at 680.

A quarter century ago, this court, in *Loudon*, was presented with the question of "whether defense counsel in a personal injury action may communicate ex parte with the plaintiff's treating physicians when the plaintiff has waived the physician—patient privilege." *Id.* at 675-76. We resolutely answered "no" and emphasized that ex parte communications with a patient's physicians are inherently dangerous and

against public policy. *Id.* at 676-78, 681. The potential for inadvertent disclosure of irrelevant, confidential information and its concomitant erosion of the physician-patient fiduciary relationship concerned us then and is of even greater concern in the corporate medicine context. The majority's attempt to find a way to allow ex parte contact while respecting the policy underlying *Loudon* is understandable, but unworkable. It exposes not only the patient-plaintiff, but also the nonparty physician and defense counsel to the very risks that the court in *Loudon* considered when it drew a bright line prohibiting ex parte contact. We should underscore, not blur, that line.

## CONCLUSION

While I appreciate the majority's attempt to balance the competing interests at stake, the solution it offers is no solution at all. No one's interests are served by a rule that allows defense counsel to engage in ex parte communications with the plaintiff's nonparty treating physicians who are employed by the defendant, but only as to facts based on their "firsthand knowledge of the alleged negligent event." Majority at 31; *see also id.* at 22. This gives very little ground to the defense, as most physician employees with such knowledge will meet the definition of "party" in the corporate medicine context. It gives even less solace to the medical malpractice plaintiff or a court seeking assurance that ex parte communications with nonparty treating physicians do not exceed this limited scope because the majority anticipates the communications with defense counsel will be privileged. *Id.* at 31 (noting defense counsel "may engage in privileged (ex parte) communications").

And it creates a precarious situation for the nonparty treating physician, who must guess right about where to draw the line between providing confidential information to the employer and breaching a fiduciary duty to the plaintiff.

The better course is to recognize that the *Loudon* rule applies fully to medical malpractice cases in which the plaintiff's nonparty treating physicians happen to be employed by the defendant. The risks sought to be minimized by the *Loudon* rule exist equally in this context, and the employer-employee relationship provides insufficient justification for a different rule. Nor does the attorney-client privilege necessitate allowing ex parte communications with nonparty treating physicians in the corporate medicine setting. Any attorney-client *relationship* exists between the defendant corporation and its counsel, not its employee physicians whose interests may materially differ from the corporation's, particularly where the physician owes a fiduciary duty to the plaintiff. Defense counsel's need "'to determine what happened,'" *id.* at 21-22 (quoting *Upjohn*, 449 U.S. at 392), is not defeated by respecting the *Loudon* rule in this context, as the facts remain fully available to both parties, albeit through normal discovery channels.

Upholding the *Loudon* rule, I concur in the majority's decision to affirm the trial court order in *Glover* prohibiting ex parte contact between defense counsel and Aolani Glover's treating physicians at the University of Washington Medical Center (UWMC).[3] I dissent from the majority's decision affirming the trial court order in

---

[3] I agree with the majority's reversal of that portion of the order barring UWMC's risk manager from ex parte contact with Glover's physicians, understanding that litigation

-13-

*Youngs* to allow limited ex parte communications with nonparty treating physicians "who have firsthand knowledge of the alleged negligent incident." *Id.* at 32. I would reverse the trial court and remand with instructions to reinstate the prior order prohibiting ex parte contact with any of Youngs' treating physicians other than Dr. Richard Leone and Dr. Donald Berry.

---

defense counsel must be screened from access to such information collected as part of quality improvement efforts.

Steph., J.

González, J.

Fairhurst, J.