[No. 85382-7.    En Banc.]
Argued May 15, 2012.    Decided September 20, 2012.

DOUG FELLOWS, *as Personal Representative, Petitioner*, v.
DANIEL J. MOYNIHAN ET AL., *Respondents*.

642

644

*Donald Lawrence Wobbrock* (of *Lawrence Wobbrock Trial Lawyer PC*) and *John Budlong* (of *Law Offices of John Budlong*), for petitioner.

*Mary H. Spillane* and *Daniel W. Ferm* (of *Williams Kastner & Gibbs PLLC*; and *Michael J. Wiswall* (of *Hart Wagner LLP*), for respondent Daniel Moynihan.

*John C. Graffe Jr.* and *Kim M. Holmes* (of *Johnson Graffe Keay Moniz*), for respondent Kathleen Hutchinson.

*Amy T. Forbis* and *Jennifer M. Gannon Crisera* (of *Bennett Bigelow & Leedom PS*), for respondent Southwest Washington Medical Center.

*Bryan P. Harnetiaux* and *George M. Ahrend* on behalf of Washington State Association for Justice Foundation, amicus curiae.

¶1 MADSEN, C.J. — This interlocutory appeal concerns a discovery dispute involving birth injuries sustained by Jordan Gallinat at Southwest Washington Medical Center (the Center) in Vancouver, Washington, on September 17, 1996. In June 2009, Douglas Fellows, as litigation guardian for Gallinat, filed a complaint alleging medical negligence and corporate negligence against Dr. Daniel Moynihan, Dr. Kathleen Hutchinson, and the Center. The trial court determined that the Center's credentialing, privileging, and personnel records for the doctors were protected from disclosure under the quality improvement privilege, RCW 70.41.200(3). This case also implicates the applicability of the peer review privilege, RCW 4.24.250.

¶2 After the Court of Appeals denied discretionary review, this court granted petition for review. Because we find that the trial court erred in concluding that no other information or records need be disclosed, we remand for in camera review of the records sought by Fellows.

## FACTS AND PROCEDURAL HISTORY

¶3 After defendant Dr. Moynihan, a family practitioner, made several unsuccessful attempts to deliver Gallinat with the hospital's vacuum extractor, Gallinat developed a subgaleal hemorrhage and fetal anoxia. The Center called upon nondefendant Dr. Jane Ahearn, an obstetrician, to deliver Gallinat by emergency C-section. Defendant Dr. Hutchinson, a pediatrician, participated in Gallinat's resuscitation.

¶4 Gallinat's doctors believe the subgaleal hemorrhage caused hypovolemic shock and hypoxia, which resulted in irreversible bilateral renal cortical necrosis, liver and renal failure, and anoxic hepatitis. They predict Jordan Gallinat will develop end-stage renal failure within the next two decades, which will require chronic dialysis (posing high mortality rates) or a kidney transplant (posing risk of graft failure).

¶5 Dr. Moynihan was issued a license to practice medicine and surgery by the state of Washington on December 14, 1992. The Center granted Dr. Moynihan staff privileges

as a family medicine practitioner in 1993. As a result of Gallinat's case and a previous obstetrical incident, the Center's executive committee initiated a corrective action against Dr. Moynihan. The Department of Health also charged Dr. Moynihan with "[i]ncompetence, negligence, or malpractice which result[ed] in injury to a patient" in "[v]iolation of rules established by any health agency." Clerk's Papers (CP) at 92 (Statement of Allegations & Summ. of Evidence). In response to these allegations and the corrective action, Dr. Moynihan stipulated to surrender of his in-hospital obstetrics and postpartum privileges.

¶6 Between March and June 2010, Fellows filed motions to compel discovery or in camera review of the hospital's credentialing, privileging, and personnel records[1] for Dr. Moynihan, Dr. Hutchinson, and Dr. Ahearn. Although the language of Fellows' discovery requests were broad and varied,[2] he focused on three types of records: (1) the privileging and credentialing records for Gallinat's treating

---

[1] Credentialing is the process of obtaining, verifying, and assessing the qualifications of a health care practitioner who is supposed to provide patient care services in a health care organization. Credentials are documented evidence of licensure, education, training, experience, or other qualifications. Privileging accompanies credentialing and is a process by which the health care organization authorizes a health care practitioner to perform specific patient care services related to his or her specialty, based on the evaluation of the individual's credentials.

[2] By way of example, Fellows requested the following documents be produced:

The complete credentialing files for Daniel J. Moynihan, M.D., Kathleen Hutchinson, M.D. and Jane Ahearn, M.D., including but not limited to all applications, resume, curriculum vitae, credentialing forms, certifications, privileges, and any correspondence, memoranda, or reports of any interviews or other records completed by Dr. Moynihan, Dr. Hutchinson and Dr. Ahearn relating to their retention as physicians by SWWMC [(Southwest Washington Medical Center)].

CP at 155. The Center objected as follows: "Objection. The documents sought are protected by the peer review privilege afforded under RCW 4.24.250 and RCW 70.41.200." *Id.* Fellows further sought "[a]ll papers, writings, documents or things relating to the subject incident, plaintiff's prenatal, perinatal and neonatal medical care or his injuries . . ." and "[a]ll incident or investigative reports and other documents relating to the investigation of the occurrence." *Id.* at 157. He also requested "[a]ll documents, memoranda, correspondence, reports or any other records relating to any changes, limitations, restrictions or revocation of the privileges granted to physicians or any other healthcare providers." *Id.* at 158.

physicians, (2) any records created for non-quality-improvement committees, and (3) those records relating to the Center's ultimate decision to restrict Moynihan's privileges.

¶7 On June 21, 2010, the trial court denied Fellows' discovery motions "except to the extent that the information or materials fall within the exceptions to the privilege described in RCW 70.41.200(3) and RCW 70.41.230(5)" and denied in camera review. CP at 285. The trial court then requested and subsequently received a certification by the hospital's lawyer stating that the hospital's credentialing, privileging, and personnel records for the doctors did not satisfy any of the exceptions to nondisclosure. The trial court accepted this certification, finding that the hospital had complied with all discovery requests.

¶8 On June 25, 2010, Fellows sought discretionary review of the trial court's orders denying discovery in the Court of Appeals. On August 30, 2010, Court of Appeals Commissioner Schmidt ruled that the trial court "committed obvious error" under *Coburn v. Seda*, 101 Wn.2d 270, 276-77, 677 P.2d 173 (1984), *Anderson v. Breda*, 103 Wn.2d 901, 905, 700 P.2d 737 (1985), and *Adcox v. Children's Orthopedic Hospital & Medical Center*, 123 Wn.2d 15, 31, 864 P.2d 921 (1993), by " 'accept[ing] [the Center's] counsel's representation that [the Center] had a regularly constituted review committee in 1996 or 1997 when OB [(obstetrician)] Cases 1 [another incident] and 2 [the Gallinat delivery] were reviewed' . . . because she had no personal knowledge about whether [the Center] had a quality improvement committee in 1996 or 1997." Br. of Pet'r, App. A at 6-7 (first alteration in original) (quoting Mot. for Discretionary Review, App. at 9-10). However, the Commissioner denied discretionary review, ruling that the declaration of hospital employee Cindy Eling satisfied the personal knowledge requirement. On November 9, 2010, the Court of Appeals denied Fellows' motion to modify.

¶9 We remand for in camera review consistent with the following: (1) the peer review privilege and quality improve-

ment privilege do not apply to records documenting a hospital's initial credentialing and privileging of a staff member; (2) the quality improvement privilege must be narrowly applied only to documents that were created specifically for, and collected and maintained by, a quality improvement committee; and (3) the quality improvement privilege does not protect a hospital's reasons for terminating or restricting a staff member's privileges.

## ANALYSIS

█ █ ¶10 Appellate courts ordinarily review discovery rulings for abuse of discretion. *E.g.*, *T.S. v. Boy Scouts of Am.*, 157 Wn.2d 416, 423, 138 P.3d 1053 (2006). However, the interpretation of statutes and judicial decisions constitute issues of law subject to de novo review. *See In re Pers. Restraint of Cruze*, 169 Wn.2d 422, 426, 237 P.3d 274 (2010); *State v. Drum*, 168 Wn.2d 23, 31, 225 P.3d 237 (2010). Preliminary questions concerning the existence of a privilege shall be determined by the court. ER 104(a).

█ ¶11 Statutes that create privileges restricting discovery are in derogation of the common law and the policy favoring discovery, and so must be strictly construed. *Adcox*, 123 Wn.2d at 31. Indeed, in *Coburn*, we specifically held that RCW 4.24.250 is to be "strictly construed and limited to its purposes." 101 Wn.2d at 276. Although *Coburn* preceded RCW 70.41.200(3), there is no reason to believe the scope of the quality improvement privilege should not conform to this same principle. The burden of establishing entitlement to nondisclosure rests with the party resisting discovery. *Anderson*, 103 Wn.2d at 905.

█ █ ¶12 The purpose of both RCW 4.24.250 and RCW 70.41.200 is to allow hospitals to effectively and candidly evaluate information concerning the hospital's experience and staff expertise in order to improve the quality of services it provides. *See Anderson*, 103 Wn.2d at 905.

¶13 RCW 4.24.250 was enacted in 1971 to prohibit discovery of records of internal proceedings where one member

of the health care profession presents evidence of negligence or incompetence against another. LAWS OF 1971, 1st Ex. Sess., ch. 144, § 1. The statute states in relevant part:

> The proceedings, reports, and written records of such [peer review] committees or boards, or of a member, employee, staff person, or investigator of such a committee or board, are not subject to review or disclosure, or subpoena or discovery proceedings in any civil action, except actions arising out of the recommendations of such committees or boards involving the restriction or revocation of the clinical or staff privileges of a health care provider.

RCW 4.24.250(1).

¶14 Inspired by the federal Health Care Quality Improvement Act of 1986 (42 U.S.C. §§ 11101-11152), the Washington Legislature enacted RCW 70.41.200 in 1986 to build upon RCW 4.24.250. LAWS OF 1986, ch. 300, § 4. Under this newer scheme, hospitals are required, among other things, to establish a coordinated quality improvement program, a quality improvement committee, and a medical malpractice prevention program; to collect information concerning negative health care outcomes; and to conduct periodic review of the competence in delivering health care services of all persons who are employed by or associated with the hospital. *Id.* The quality improvement committee has the responsibility "to review the services rendered in the hospital, both retrospectively and prospectively, in order to improve the quality of medical care of patients and to prevent medical malpractice." RCW 70.41.200(1)(a). The committee is also obligated to monitor and review the performance of its staff, including the "maintenance and continuous collection of information concerning the hospital's experience with negative health care outcomes and incidents injurious to patients." RCW 70.41.200(1)(e).

¶15 The quality improvement statute's privilege only dictates "[i]nformation and documents, including complaints and incident reports, created specifically for, and collected and maintained by, a quality improvement com-

mittee are not subject to . . . discovery or introduction into evidence in any civil action." RCW 70.41.200(3). RCW 70.41-.200(3)(d) adds that even where nondisclosure would otherwise be proper, a hospital must disclose the fact that it has terminated or restricted a staff member's privileges and its reasons for doing so.

## 1. Application of the Peer Review Privilege (RCW 4.24-.250) to Initial Credentialing and Privileging Records

¶16 The Center's initial credentialing and privileging of staff members occurs outside of a peer review committee before a staff member would have provided reviewable services at the hospital.

¶17 The court in *Anderson*, 103 Wn.2d at 905-06, observed that application of RCW 4.24.250 is appropriate only when two components are present: (1) records sought have been generated in a regularly constituted committee or board of the hospital whose duty it is to review and evaluate the quality of patient care or the competency and qualifications of members of the profession and (2) records sought are the proceedings, reports, and written records of the committee. These components must be strictly construed such that the privilege is limited to its intended purpose. *See Adcox*, 123 Wn.2d at 31. The court in *Anderson* went on to frame the scope of the peer review privilege as follows:

Although the extent of a physician's hospital privileges may be determined by what occurs within a quality review committee, the fact that a physician's privileges are restricted, suspended or revoked is not properly subject to the protections of the statute. The goal and fundamental purpose of the statute is open discussion during committee investigations. Open discussion is not inhibited by permitting discovery of the effect of the committee proceedings. The purpose of this statute is to keep peer review studies, discussions, and deliberations confidential. A facial examination of the statute reveals that it is not

designed to obstruct discovery as to whether a physician's privileges had been revoked or suspended.

*Anderson*, 103 Wn.2d at 907.

¶18 Fellows claims that credentialing, privileging, and personnel records are not exempt from discovery under the peer review privilege in RCW 4.24.250 because the privilege applies only to retrospective review of patient care. Moynihan responds that the retrospective or prospective nature of a committee's review is merely one factor among many in determining whether a document is privileged under RCW 4.24.250.

¶19 Moynihan is correct that the retrospective or prospective nature of a committee's review is not dispositive of the applicability of the peer review privilege. *See Anderson*, 103 Wn.2d at 906 (citing *Coburn*, 101 Wn.2d at 278). The retrospective/prospective analysis stems from the statutory purpose of protecting committee investigations to allow constructive criticism necessary to effective quality review. *Id.* at 905. Retrospective review is more likely than prospective review to involve an evaluation of the quality of care provided by a hospital employee. Yet, it is possible for a committee to prospectively investigate a hospital employee's ability to provide a particular service.

¶20 In any case, it does not appear here that the Center's executive committee conducted any peer review of Drs. Moynihan, Ahearn, or Hutchinson prior to Gallinat's delivery, and afterward it reviewed only Dr. Moynihan; certainly, there is nothing in the record to suggest peer review was underway at the time of the initial credentialing and privileging process. After the delivery, on September 17, 1997, the Center's executive committee initiated corrective action that resulted in Dr. Moynihan losing his vaginal delivery privileges until he completed a miniresidency and was proctored for 30 obstetrical cases (which he opted not to do). Proceedings, reports, and written records prepared for

or by the executive committee[3] for the purpose of analyzing Dr. Moynihan's ability to perform deliveries leading up to the decision to revoke his privileges would fall under the peer review privilege. If hospital staff members on the peer review committee otherwise generated documents regarding Dr. Moynihan's performance and the liability risks he presents, then those documents too would be protected from disclosure under the peer review privilege. Records created here before the peer review began, after it was completed, or for purposes other than the committee's evaluation of Dr. Moynihan's ability to deliver babies do not satisfy the two component requirements of the privilege set forth in *Anderson*. Because the initial credentialing and privileging preceded any peer review, the peer review privilege does not apply to these records.

2.   Application of the Quality Improvement Privilege (RCW 70.41.200)

¶21 Moynihan urges that the quality improvement privilege should be read broadly to facilitate and encourage critical self-examination by hospitals both to improve quality of care and to prevent malpractice. He reasons that "[c]ritical self-assessment by hospitals is hardly encouraged or incentivized if records of that process" are made readily available to plaintiffs' lawyers. Joint Br. of Resp'ts at 23-24. According to Moynihan, it follows that credentialing is always a quality review activity.

¶22 The quality improvement statute *does* require the periodic review of staff credentials, the physical and mental capacity of staff members, and their compe-

---

[3] As discussed, for the peer review privilege to apply, the trial court must find as a factual matter that an entity at a hospital constitutes a regularly constituted committee or board of the hospital whose duty it is to review and evaluate the quality of patient care. *See Anderson*, 103 Wn.2d at 905-06. The record in this case demonstrates that the trial court made this finding as to the executive committee. Further, Fellows did not challenge this finding, instead claiming that the records in this case fall outside the scope of the peer review and quality improvement privileges.

tence in delivering health care services. RCW 70.41-.200(1)(c). However, while the legislature may have intended protection of the periodic review process, it did not extend this protection to the initial credentialing and privileging process.[4] RCW 70.41.200(1)(a) directs a quality improvement committee to review "services rendered," but at the time that a new staff member like Dr. Moynihan is privileged, he has yet to provide any service at the hospital. Indeed, the initial grant of staff privileges does not further the purposes of a quality improvement program but instead establishes the nature and extent of the relationship between a staff member and a hospital. Until the relationship between a staff member and a hospital is formalized through the initial credentialing/privileging process and that staff member has provided services at the hospital, there is nothing for a quality improvement committee to review.[5]

¶23 The Center urges, though, that because a quality improvement committee must review its services both retrospectively and prospectively, this court should conclude that there is no meaningful difference between initial credentialing and subsequent periodic review. *See* RCW 70.41.200(1)(a).

¶24 Unlike initial credentialing and privileging, periodic review offers a committee the opportunity to review ser-

---

[4] Fellows argues that in *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997), this court already decided that credentialing, privileging, and personnel records are not exempt from discovery under the quality improvement privilege. He reasons that the *Burnet* court would not have ordered discovery of the treating physicians credentialing records if they were privileged under the statutes at issue in this case.

Moynihan counters that *Burnet* was limited to finding that an order precluding discovery in negligent credentialing and privileging claims against the defendant hospital was too severe a sanction for the plaintiff's procedural omissions.

Moynihan is correct that *Burnet* concerns the appropriateness of a discovery sanction. *See id.* at 497. The court did not discuss the substance or application of the peer review privilege or the quality improvement privilege and does not resolve the issue presented in this case.

[5] The quality improvement committee reviews "services rendered *in the* hospital." RCW 70.41.200(1)(a) (emphasis added).

vices provided at the hospital and to ensure that its staff members are providing services in a competent manner. So that quality improvement committee members may candidly and effectively do their jobs, the quality improvement privilege provides protection to them and to the information and documents on which they rely. It is this review process that the legislature apparently intended to protect.

¶25 The quality improvement privilege must be narrowly construed in favor of discovery. *See Adcox*, 123 Wn.2d at 31. It is not necessarily the case that all records documenting a hospital's efforts to comply with the statutorily mandated quality improvement program are privileged; indeed, the quality improvement privilege requires that protected documents be "created specifically for, and collected and maintained by, a quality improvement committee." RCW 70.41.200(3).

¶26 The "created specifically for" and "collected and maintained by" requirements guard against a hospital funneling records through its quality improvement committee in order to make them undiscoverable.

¶27 A broad reading as urged by the defendants would insulate any document relating to any decision that might have some effect on the quality of services a hospital provides and would allow a hospital to withhold all records relating to hiring, firing, facility maintenance, management decisions, scheduling, and the services each staff member is authorized to provide. Indeed, the majority of records a hospital creates might be somehow related to the quality of care it provides. But the privilege "may not be used as a shield to obstruct proper discovery of information generated outside review committee meetings." *Coburn*, 101 Wn.2d at 277 (referring to the peer review privilege but also applicable to the quality improvement privilege). By requiring a record be "created specifically for" and "collected and maintained by" the committee, the legislature intended to limit the scope of the privilege.

¶28 The Center has failed to show how disclosure of records documenting its staff members' initial credentialing/privileging and its reasons for restricting a staff member's privileges would hinder the legislative purpose of encouraging internal candor, open discussions, and constructive criticism. *See Lowy v. PeaceHealth*, 174 Wn.2d 769, 774, 778, 780, 280 P.3d 1078 (2012). We reject the Center's invitation to broaden the protections afforded by the legislature.

¶29 We turn next to the records related to restrictions placed on Dr. Moynihan. While the statute provides a privilege for information and documents created specifically for, and collected and maintained by, a quality improvement committee, RCW 70.41.200(3), the rule contains an exception to nondisclosure for "disclosure of the fact that staff privileges were terminated or restricted, including the specific restrictions imposed, if any and the reasons for the restrictions." RCW 70.41.200(3)(d).

¶30 The plain language of the statute requires that a hospital disclose the fact that it has terminated or restricted a staff member's privileges and its reasons for doing so. At present, the Center has disclosed only that it restricted Dr. Moynihan's operative vaginal delivery privileges in response to his performance in delivering Gallinat and one other baby; it has failed to disclose its reasons for doing so. Because the records in this case have not been made available to this court, we remand to the trial court to decide which records to disclose.

## 3. Fellows Properly Requested the Records at Issue

¶31 The trial court in this case ruled that the Center complied with the discovery requests in this case because it looked in its credentialing files and found no nonprivileged records. The Center claims and the trial court apparently accepted that the Center did not have to look in its investigative files (where the requested records are actually located) because Fellows repeatedly used the modifying

words "credentialing," "privileging," and "personnel," rather than simply requesting all files.

¶32 We reject the Center's narrow understanding of Fellows' request for production. On at least two occasions, this court has held that a party is not required to specify the exact file in which certain records are held. This court has held that "[a] corporation must search all of its departments, not just its legal department, when a party requests information about other claims during discovery." *Magana v. Hyundai Motor Am.*, 167 Wn.2d 570, 585, 220 P.3d 191 (2009). This court has also sanctioned a defendant and its lawyer for not identifying or producing "smoking gun" documents discussing the dangers of the drug theophylline, after the plaintiff clearly articulated the type of records it sought but misidentified the folder in which they were actually held. *See Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 352, 356, 858 P.2d 1054 (1993).

¶33 Fellows requested all credentialing forms, certifications, and privileges; that he failed to identify their location as the "investigative files" for the doctors does not excuse the defendants from complying with discovery. As we have noted, the party seeking discovery cannot be expected to know how the other party organizes its records. *See id.*

4. **The Trial Court on Remand Must Determine if Discovery Sanctions Are Appropriate**

¶34 Fellows argues that the Center failed to comply with a discovery order issued by the trial court, triggering sanctions under CR 37(b)(2). The trial court's May 4, 2010 order required the Center to produce all information and documents covered by RCW 70.41.200(3)(d) that related to its termination or restriction of Dr. Moynihan's hospital privileges. At the June 21, 2010 hearing on the in camera review motion, the trial court again ruled that any information covered by RCW 70.41.200(3)(d) must be disclosed.

CR 37(b)(2) provides a list of possible actions a court might take to remedy a party's failure to obey a discovery order. CR 37(b)(2) also provides:

> In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him or both to pay the reasonable expenses, including attorney fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

¶35 Because the records at issue in this case have not been made available to this court, the trial court on remand is better positioned to determine whether the Center's failure to provide its reasons for restricting Dr. Moynihan's delivery privileges was "substantially justified." If the failure was not "substantially justified," then Fellows is entitled to reasonable expenses, including attorney fees, caused by the failure.

## CONCLUSION

¶36 We hold that the peer review privilege and quality improvement privilege do not apply to records documenting a hospital's initial credentialing and privileging of a staff member. We further hold that the quality improvement privilege must be narrowly applied only to documents that were created specifically for, and collected and maintained by, a quality improvement committee. Finally, we hold that the quality improvement privilege does not protect a hospital's reasons for terminating or restricting a staff member's privileges. We remand this matter to the trial court for an in camera review and to determine if discovery sanctions should be imposed.

C. JOHNSON, CHAMBERS, OWENS, FAIRHURST, J.M. JOHNSON, STEPHENS, WIGGINS, and GONZÁLEZ, JJ., concur.