FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
NOVEMBER 12, 2020

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
NOVEMBER 12, 2020

SUSAN L. CARLSON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DOUG HERMANSON, an individual, | ) | |
| | ) | |
| Respondent/Cross-Appellant, | ) | No. 97783-6 |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| MULTICARE HEALTH SYSTEM, INC., a | ) | |
| Washington Corporation d/b/a TACOMA | ) | Filed: November 12, 2020 |
| GENERAL HOSPITAL, JANE and JOHN | ) | |
| DOES 1-10 and their marital communities | ) | |
| comprised thereof, | ) | |
| | ) | |
| Petitioners/Cross-Respondents. | ) | |
| | ) | |

OWENS, J. — This case considers the boundaries of the corporate attorney-client privilege and how it operates when in conflict with a plaintiff's physician-patient privilege. First, we are asked to determine whether the corporate attorney-client privilege allows a defendant hospital to have ex parte communications with a plaintiff's nonparty treating physician who is the hospital's independent contractor, but not its employee. We held in *Youngs v. PeaceHealth* that a defendant hospital may have ex parte communications with a plaintiff's nonparty treating physician—

who is the hospital's employee—provided those communications are limited to the facts surrounding the alleged negligent event. 179 Wn.2d 645, 671, 316 P.3d 1035 (2014). We now hold that the nonparty physician in this case, while technically an independent contractor of MultiCare, still maintains a principal-agent relationship with MultiCare and serves as the "functional equivalent" of a MultiCare employee such that *Youngs* would apply in this case; therefore, MultiCare may have ex parte communications with the physician under the same limitations we set forth in *Youngs*.

Second, we are asked to determine whether the corporate attorney-client privilege extends to communications between MultiCare and its nonphysician employees who treated the plaintiff—specifically, two nurses and a social worker. Because the nurse-patient privilege and the social worker-client privilege are essentially identical in purpose to the physician-patient privilege, and because we already held in *Youngs* that the corporate attorney-client privilege trumps the physician-patient privilege when the hospital needs to gather information about the alleged negligent event, we hold that MultiCare may have ex parte communications with these nonphysician employees under the limitations we set forth in *Youngs*.

Accordingly, we reverse the Court of Appeals' judgment as to MultiCare's ex parte communications with the physician, affirm the Court of Appeals' judgment as to MultiCare's ex parte communications with the nurses and the social worker, and remand to the trial court for further proceedings consistent with this opinion.

FACTS AND PROCEDURAL HISTORY

On September 11, 2015, Doug Hermanson sideswiped an unoccupied vehicle and crashed into a utility pole. Hermanson was transported to Tacoma General Hospital, which is owned by MultiCare Health System Inc. Hermanson was treated by several MultiCare employees, including two nurses and a crisis intervention social worker. However, the physician who treated Hermanson, Dr. Patterson, is an independent contractor of MultiCare pursuant to a signed agreement between MultiCare and Trauma Trust, his employer. Trauma Trust was created by MultiCare; Dr. Patterson has his own office at Tacoma General Hospital and is expected to abide by MultiCare's policies and procedures.

During Hermanson's treatment, an unidentified person at Tacoma General Hospital conducted a blood test on Hermanson that showed a high blood alcohol level. As a result, someone reported this information to the police, and the police charged Hermanson with first degree negligent driving and hit and run of an unattended vehicle.

Based on this disclosure of his blood alcohol results, Hermanson sued MultiCare and multiple unidentified parties for negligence, defamation/false light, false imprisonment, violation of Hermanson's physician-patient privilege under RCW 5.60.060(4), and unauthorized disclosure of Hermanson's confidential health information under RCW 70.02.020(1). MultiCare retained counsel to jointly represent

MultiCare, Dr. Patterson, and Trauma Trust, reasoning that while Dr. Patterson and Trauma Trust were not identified parties, Hermanson's initial demand letter implicated both parties. Hermanson objected to this joint representation and argued that MultiCare's ex parte communications with Dr. Patterson violated Hermanson's physician-patient privilege. MultiCare subsequently filed a motion for a protective order to have ex parte communications with Dr. Patterson. In the same motion, MultiCare sought to protect its ex parte communications with the two nurses and the social worker who cared for Hermanson. In response, the trial court

1.  Denied MultiCare's motion as to Dr. Patterson,

2.  Granted MultiCare's motion as to the two nurses, and

3.  Denied MultiCare's motion as to the social worker.

The trial court reasoned that based on *Youngs*, 179 Wn.2d at 671, Dr. Patterson is not a MultiCare employee and thus does not fall under the corporate attorney-client privilege, and the social worker does not fall under any type of medical privilege. However, the trial court held Hermanson's nurses qualified under the corporate attorney-client privilege because they are MultiCare employees.

The trial court further ordered MultiCare to seek leave of court before it spoke with any other MultiCare employees. Both parties filed a motion for reconsideration, which the trial court denied.

MultiCare then filed a motion for discretionary review with the Court of Appeals, and the Court of Appeals treated Hermanson's response as a cross motion for discretionary review. The Court of Appeals affirmed in part and reversed in part. *Hermanson v. MultiCare Health Sys., Inc.*, 10 Wn. App. 2d 343, 346, 448 P.3d 153 (2019). Specifically, the Court of Appeals

1. Affirmed the trial court's ruling as to Dr. Patterson (no ex parte contact),

2. Affirmed the trial court's ruling as to the two nurses (permitting contact), and

3. *Reversed* the trial court's ruling as to the social worker (permitting contact).

*Id.* The Court of Appeals agreed that MultiCare was not authorized to have ex parte communications with Dr. Patterson because he is not a MultiCare employee. *Id.* But using the same reasoning, the Court of Appeals held that MultiCare *may* have ex parte communications with the nurses and the social worker who cared for Hermanson because they *are* MultiCare employees. *Id.* at 363-64. Judge Glasgow concurred with the majority regarding the nonphysician employees, but dissented as to Dr. Patterson; Judge Glasgow reasoned that the corporate attorney-client privilege does not hinge on whether the physician is an employee or an agent, and that MultiCare should be allowed to communicate with Dr. Patterson regarding Hermanson's injuries at issue because Dr. Patterson admitted he is MultiCare's agent and Dr. Patterson is the "functional equivalent" of a MultiCare employee. *Id.* at 369, 371 (Glasgow, J., concurring in part, dissenting in part).

Both parties filed petitions for review, which were granted. *Hermanson v. MultiCare Health Sys., Inc.*, 194 Wn.2d 1023 (2020). The Washington State Association for Justice Foundation, the Washington State Hospital Association, the Washington State Medical Association, and the American Medical Association all filed amicus briefs.

ANALYSIS

Though we ordinarily review a trial court's discovery rulings for an abuse of discretion, a trial court's interpretations of statutes and judicial decisions constitute issues of law, which we review de novo. *Fellows v. Moynihan*, 175 Wn.2d 641, 649, 285 P.3d 864 (2012). The attorney-client privilege protects clients from disclosure of confidential communications made between the client and their attorney within the course of the attorney's professional employment. RCW 5.60.060(2). This privilege exists "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). This privilege extends to corporations and their hired counsel and will sometimes apply to midlevel and lower level corporate employees. *Id.* at 390, 394, 395; *Newman v. Highland Sch. Dist. No. 203*, 186 Wn.2d 769, 777-78, 381 P.3d 1188 (2016).

However, defense counsel may not engage in ex parte communications with a plaintiff's treating physicians. *Loudon v. Mhyre*, 110 Wn.2d 675, 676, 756 P.2d 138 (1988) (hereinafter the "*Loudon* rule"). We promulgated this rule because "[t]he mere threat that a physician might engage in private interviews with defense counsel would, for some, have a chilling effect on the physician-patient relationship and hinder further treatment." *Id.* at 679. The *Loudon* rule further ensures that physicians may maintain their own ethical duties under the Hippocratic Oath and under the American Medical Association's guidelines. *Id.*

In a medical malpractice lawsuit, a hospital defendant's corporate attorney-client privilege often conflicts with the plaintiff's physician-patient privilege— specifically when the plaintiff's treating physician is the defendant's employee. RCW 5.60.060(4); *see Youngs*, 179 Wn.2d at 661. Thus, in *Youngs*, we reevaluated the *Loudon* rule and held, "If *Loudon* conflicts with a defendant's corporate attorney-client privilege . . . it must yield to that privilege." *Id.* at 671. Specifically, we held that a corporate defendant's attorney "may engage in privileged (ex parte) communications with the corporation's physician-employee where the physician-employee has firsthand knowledge of the alleged negligent event and where the communications are limited to the facts of the alleged negligent event." *Id.*

We are now faced with two new questions that we did not expressly answer in *Youngs*: First, can this exception apply to a plaintiff's treating physician who is an

independent contractor of the defendant, not an employee?  And second, does this exception extend to a plaintiff's treating nurses and social worker who are the defendant's employees?  For the reasons discussed below, we conclude that *Youngs* can apply to a plaintiff's treating physician who is an independent contractor of the defendant so long as there is a principal-agent relationship between the physician and the defendant hospital; we conclude this is true for Dr. Patterson and MultiCare.  We further conclude that *Youngs* does extend to a plaintiff's treating nurses and social worker who are employees of the defendant hospital.

      1.  *The Corporate Attorney-Client Privilege Applies to Dr. Patterson, Subject to the Limitations in* Youngs

The physician-patient privilege "prohibits a physician from being compelled to testify, without the patient's consent, regarding information revealed and acquired for the purpose of treatment."  *Loudon*, 110 Wn.2d at 677-78; *see also* RCW 5.60.060(4).  In *Youngs*, we created an exception to this privilege when it conflicts with the defendant hospital's corporate attorney-client privilege.  *See Youngs*, 179 Wn.2d at 671.  In *Youngs*, the plaintiff objected to the hospital having ex parte interviews with his treating health care providers, who were the hospital's employees.  *Id.* at 653-54.  While we reflected that the physician-patient privilege "'is a fiduciary one of the highest degree,'" *id.* at 659 (internal quotation marks omitted) (quoting *Loudon*, 110 Wn.2d at 679), we also reasoned that the corporate attorney-client privilege must be protected.  Thus, we adopted a modified version of the corporate attorney-client

privilege discussed in the United States Supreme Court's *Upjohn* decision to permit a corporate defendant to speak ex parte with its employees who have firsthand knowledge of the incident, so long as such communications "are limited to the facts of the alleged negligent event." *Id.* at 671.

Hermanson argues, and the lower courts agreed, that *Youngs* is limited to nonparty physicians who are the hospital defendant's employees—not its independent contractors. However, *Youngs* was not decided based on this distinction but was, instead, based on "counsel's ability to 'ascertain[ ] the factual background' of a 'legal problem'" and corporate counsel's ability "'to determine what happened' to trigger the litigation." *Id.* at 664 (alteration in original) (internal quotation marks omitted) (quoting *Upjohn*, 449 U.S. at 390, 392). As Judge Glasgow correctly stated in her dissent, *Upjohn* and *Youngs* had "the central goal of promoting candid and honest communication between a corporation's attorney and the individuals acting as agents of the corporation who may know the factual details germane to the legal problem." *Hermanson*, 10 Wn. App. 2d at 370 (Glasgow, J., concurring in part, dissenting in part). Regardless if Dr. Patterson is an independent contractor, both parties state that Dr. Patterson treated Hermanson for the injuries at issue in their lawsuit and performs work on behalf of MultiCare. Dr. Patterson has the information to "'determine what happened' to trigger the litigation," and *Youngs* does not restrict MultiCare from consulting Dr. Patterson on these matters because of Hermanson's physician-patient

privilege. *Id.* at 363 (internal quotation marks omitted) (quoting *Youngs*, 179 Wn.2d at 664).

Furthermore, pursuant to our holding in *Newman*, Dr. Patterson still maintains a principal-agent relationship with MultiCare such that they should be allowed to have ex parte communications limited by our holding in *Youngs*. In *Newman*, we held the corporate attorney-client privilege does not extend to former employees because "[w]ithout an ongoing obligation between the former employee and employer that *gives rise to a principal-agent relationship*, a former employee is no different from other third-party fact witnesses to a lawsuit." 186 Wn.2d at 780 (emphasis added). We did not extend the corporate attorney-client privilege to former employees in *Newman* because such former employees "c[ould] no longer bind the corporation and no longer owe[d] duties of loyalty, obedience, and confidentiality." *Id.*

In *Newman*, we relied on the *Restatement (Third) of the Law Governing Lawyers*. *See id*. Under this restatement, "[t]he concept of agent . . . includes independent contractors with whom the corporation has a principal-agent relationship." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 73 cmt. d (AM. LAW INST. 2000). When determining if there is a principal-agent relationship between two parties, "'the most crucial factor is the right to control the details of the work.'" *Wilcox v. Basehore*, 187 Wn.2d 772, 789, 389 P.3d 531 (2017) (quoting *Larner v. Torgerson Corp.*, 93 Wn.2d 801, 804-05, 613 P.2d 780 (1980)).

In this case, Dr. Patterson's employer, Trauma Trust, is an organization formed in part by MultiCare, and even though Dr. Patterson is not a MultiCare employee, he is expected to abide by MultiCare policies and procedures as a trauma surgeon; he even has his own office inside Tacoma General Hospital, which is operated by MultiCare. Based on the relationship that exists between MultiCare and Trauma Trust, Dr. Patterson still "owes duties of loyalty, obedience, and confidentiality" to MultiCare regardless of his status as an independent contractor. *Newman*, 186 Wn.2d at 780. The fact that MultiCare and Trauma Trust list Dr. Patterson as an "independent contractor" in their agreement does not alter the fact that MultiCare controls Dr. Patterson's conduct by ensuring he abides by MultiCare's policies and procedures.

Finally, Dr. Patterson serves as the "functional equivalent" of MultiCare's employee, in line with persuasive authorities from the federal Eighth and Ninth Circuit Courts of Appeals. *See In re Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994); *see also United States v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010). In *Bieter*, the Eighth Circuit held that the corporate attorney-client privilege extended to nonemployees "who possess a 'significant relationship to the [client] and the [client]'s involvement in the transaction that is the subject of legal services.'" 16 F.3d at 938 (alterations in original) (quoting John E. Sexton, *A Post-*Upjohn *Consideration of the Corporate Attorney-Client Privilege*, 57 N.Y.U. L. REV. 443, 487 (1982)). Similarly, in *Graf*,

the Ninth Circuit held that while the defendant was an outside consultant for

Employers Mutual, he was still the "functional equivalent" of an employee because he

"communicated with insurance brokers and agents on behalf of Employers Mutual,

. . . managed company employees . . . [and] was the company's primary agent in its

communications with corporate counsel." 610 F.3d at 1159.

Dr. Patterson performs work for MultiCare similar to the parties in *Bieter* and

*Graf*. Like the nonemployee in *Bieter*, Dr. Patterson maintains a "significant

relationship" to MultiCare, as Dr. Patterson performs work on behalf of MultiCare as

a trauma surgeon and reports his work pursuant to MultiCare's and Trauma Trust's

agreement. Clerk's Papers at 475-76. And similar to the nonemployee in *Graf* who

performed multiple employee-equivalent tasks on behalf of Employers Mutual that

Employers Mutual monitored, Dr. Patterson conducts work on patients in Tacoma

General Hospital under the purview of MultiCare and has his own office inside

Tacoma General Hospital, essentially working on behalf of *both* MultiCare and

Trauma Trust. Unlike most independent contractors who are hired on a project-by-

project basis, Dr. Patterson constantly performs work in a MultiCare facility that is

consistently monitored by MultiCare, thus making him the "functional equivalent" of

a MultiCare employee.

Therefore, based on *Youngs* and *Newman*, and in keeping with the Eighth and

Ninth Circuits' holdings in *Bieter* and *Graf*, we hold that MultiCare may have ex parte

communications with Dr. Patterson "limited to the facts of the alleged negligent event." *Youngs*, 179 Wn.2d at 671. Our holding ensures we do not erode the *Loudon* rule—recognizing that a patient's physician-patient privilege must be well protected—while acknowledging that we must continue to allow corporations to effectively "'ascertain[ ] the factual background'" of any alleged incidents that involve their agents or employees. *Id.* at 664 (quoting *Upjohn*, 449 U.S. at 390).

Both parties raise arguments regarding whether MultiCare's alleged vicarious liability for Dr. Patterson's actions affects whether MultiCare and Dr. Patterson should be allowed to have ex parte communications. MultiCare's Suppl. Br. at 5-12; Resp. to MultiCare's Pet. for Review and Cross-Pet. for Review at 7-8. Both parties miss the point. Whether there is vicarious liability between two defendants is separate from whether such parties may have ex parte communications with one another under evidentiary privilege. *See Wright v. Grp. Health Hosp.*, 103 Wn.2d 192, 202, 691 P.2d 564 (1984)) ("A corporate employee who is a 'client' under the attorney-client privilege is not necessarily a 'party' for purposes of the disciplinary rule."). Determining whether a corporate hospital may have ex parte communications with the plaintiff's nonparty treating physician does not necessarily answer whether the

hospital is vicariously liable for the physician's actions. The trial court has not yet ruled on vicarious liability here, and we do not rule on it now.[1]

>    2.  *The Corporate Attorney-Client Privilege Applies to the MultiCare Nurses and the Social Worker Who Treated Hermanson, Subject to the Limitations in* Youngs

In its ruling, the Court of Appeals reasoned that since neither the nurse-patient privilege nor the social worker-client privilege have "divergent underlying policies" from the physician-patient privilege, the corporate attorney-client privilege also trumps these two privileges when the corporation is seeking to gather information surrounding the alleged negligent event. *Hermanson*, 10 Wn. App. 2d at 363-64. We agree. We held in *Youngs* that the defendant hospital's attorney-client privilege trumps the plaintiff's physician-patient privilege when the physician is the defendant's employee; so it follows that unless the nurse-patient privilege or the social worker-client privilege is more protective than the physician-patient privilege, the corporate attorney-client privilege also trumps these privileges when applied under similar circumstances.

---

[1] MultiCare further argues that it should be allowed to have ex parte communications with a plaintiff's treating physician if it enters into a representation agreement with the physician. MultiCare's Suppl. Br. at 13-15. But MultiCare's argument would allow any corporation to circumvent a plaintiff's physician-patient privilege by entering into a representation agreement with a treating physician, rendering the physician-patient privilege moot whenever the corporation chooses. Our holding here is strictly limited to allowing ex parte communications between MultiCare and Dr. Patterson based on the limitations already set in *Youngs*.

The nurse-patient privilege is codified at RCW 5.62.020, and the social worker-client privilege is codified at RCW 5.60.060(9); both operate in a similar fashion as the physician-patient privilege. *Compare with* RCW 5.60.060(4). The legislature enacted the nurse-patient privilege because, based on the similar work nurses and physicians conduct with their patients, "policy considerations . . . dictate[d] application of a privilege for registered nurses similar to the physician privilege." SUBSTITUTE S.B. REP. 4107, 49th Leg., Reg. Sess., at 1 (Wash. 1985). And when the legislature enacted the social worker-client privilege, it considered clients' fears that information they had shared with their social workers would be "divulged in a court of law," SUBSTITUTE S.B. REP. 5931, 61st Leg., Reg. Sess., at 2 (Wash. 2009), similar to patients' fears of their physicians divulging their information. *See Loudon*, 110 Wn.2d at 678 ("The danger of an ex parte interview is that it may result in disclosure of irrelevant, privileged medical information."). In other words, both privileges are identical in their policies to the physician-patient privilege.

The intent behind our decision in *Youngs* was to ensure "'full and frank communication'" between the corporate defendant and its employees and agents to discover the facts surrounding the alleged negligent event. 179 Wn.2d at 650 (internal quotation marks omitted) (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 131 S. Ct. 2313, 180 L. Ed. 2d 187 (2011)). We clearly indicated that this goal under a corporation's attorney-client privilege trumps the *Loudon* rule and the

15

plaintiff's physician-patient privilege. *Id.* at 664. Since the policies underlying the nurse-patient and social worker-client privileges reflect that they are just as strong as the physician-patient privilege, they should also make way for the corporate attorney-client privilege in this context. Were we to now hold otherwise, such a ruling would unnecessarily limit a corporate defendant's ability to prepare for litigation and blur our holding in *Youngs*. Therefore, we hold that MultiCare may have ex parte communications with the nurses and the social worker who cared for Hermanson, "limited to the facts of the alleged negligent event." *Id.* at 671.

MultiCare requests this court to make a blanket statement as to whether *Youngs* and *Loudon* apply to all nonphysician health care employees. MultiCare's Reply Br. at 13-15. We will not entertain MultiCare's request. We decided *Youngs* by balancing two significant, historical sets of privileged communications, ultimately creating an exception to the *Loudon* rule, 179 Wn.2d at 662-63, and the present case reaches only two nonphysician privileges. Other privileges still exist that are not at issue in this case that could conflict with a hospital's corporate attorney-client privilege. *See, e.g.*, RCW 5.60.060(7), (7)(a) (sexual assault advocates who work for an association that provides medical and/or legal advice); RCW 5.60.060(8), (8)(a) (domestic violence advocates who work for a human services program); RCW 5.60.060(3) (clergy members, which easily applies in health care settings when such

members are serving as hospital chaplains).  Defining the appropriate interaction of

these various privileges is not germane to this case and is not properly before us.

> 3. *The Court of Appeals Erred by Holding That the Corporate Attorney-Client Privilege Applies to the Nonphysician Employees on the Basis That They Are "Named Parties" to Hermanson's Lawsuit*

The Court of Appeals held that because the nurses and the social worker are

"named parties" in Hermanson's lawsuit, MultiCare is authorized to have ex parte

communications with these nonphysician employees.  *Hermanson*, 10 Wn. App. 2d at

364.  The Court of Appeals is incorrect.  The nurses and the social worker are not

"named parties" because a plaintiff may list a party as "unknown" only if the plaintiff

does not know that party's identity, but the plaintiff may then amend the complaint

once the plaintiff discovers the party's identity.  CR 10(a)(2).  Based on the record,

Hermanson clearly knows these employees' identities and has not added their names

to his complaint.  Therefore, we reject the Court of Appeals' reasoning here.

> 4. *We Decline Review of Hermanson's Miscellaneous Claims Raised in His Supplemental Brief*

Hermanson requests in his supplemental brief that we overrule *Youngs*.

Resp't's/Cross-Appellant's Suppl. Br. at 1-8.  He also argues that the Court of

Appeals erred in reversing the trial court's order that MultiCare seek leave of court

before engaging in any further ex parte contact with its employees.  *Id.* 13-15;

*Hermanson*, 10 Wn. App. 2d at 346.  Neither issue was raised in his cross petition for

17

review (PRV), nor does MultiCare discuss these issues in its PRV or reply brief.[2]

When granting review of a Court of Appeals decision, we "will review only the questions raised in the . . . petition for review and the answer, unless [we] order[] otherwise upon the granting of the motion or petition." RAP 13.7(b). Our order granting the parties' PRVs did not stipulate that Hermanson may raise these miscellaneous claims in his supplemental brief, so we do not review them here. *See Hermanson*, 194 Wn.2d 1023.

## CONCLUSION

We hold that MultiCare may have ex parte communications with Dr. Patterson limited to the facts of the alleged negligent event. Additionally, we hold that *Youngs* extends to a defendant hospital's employee nurses and social workers, and MultiCare may have ex parte communications with the nurses and the social worker who treated Hermanson under the same limitations. Accordingly, we reverse the Court of Appeals' judgment as to ex parte communications with Dr. Patterson, affirm the Court of Appeals' judgment as to ex parte communications with the nurses and the social worker, and remand to the trial court for further proceedings consistent with this opinion.

---

[2] MultiCare mentions that Hermanson seeks reversal of the Court of Appeals' decision striking down this leave of court order, MultiCare's Reply Br. at 4, but Hermanson makes no mention of it in his own cross PRV, and MultiCare does not discuss this issue in its PRV or reply brief.

WE CONCUR:

_____          _____
                                              Owens, J.

_____          _____
                                       Gordon McCloud, J.

_____          _____
                                              Yu, J.

Madsen, J.                          _____
                                       Montoya-Lewis, J.

_____          _____
                                            Chun, J.P.T.

19

*Hermanson v. MultiCare Health System, Inc. et al.*
(Stephens, C.J., concurring in part, dissenting in part)


No. 97783-6


STEPHENS, C.J. (concurring in part, dissenting in part)—Six years ago in *Youngs v. PeaceHealth*, we created a narrow exception to the bright-line rule that protection of the physician-patient relationship requires defense counsel may not engage in ex parte contacts with plaintiff's physicians. 179 Wn.2d 645, 673, 316 P.3d 1035 (2014) (Stephens, J., concurring in part/dissenting in part) (citing *Loudon v. Mhyre*, 110 Wn.2d 675, 682, 756 P.2d 138 (1988)). This narrow exception is rooted in the corporate attorney-client privilege, which requires corporate counsel be able to investigate the circumstances potentially giving rise to corporate liability. *Id.* at 663. I accept that *Youngs* is now the law, but the balance struck in *Youngs* concerned only treating health care providers who are employees of the defendant— here, it allows MultiCare's counsel to have ex parte contact with its two employee

nurses and social worker who treated Doug Hermanson. With respect to the plaintiff's nonemployee treating physician, Dr. Patterson, the policy underlying the *Loudon* rule must prevail and require the use of formal discovery processes.

Today's majority disrupts the balance of policy considerations and tips the scales dramatically in favor of medical corporations by extending *Youngs*'s logic— in conflict with our precedent regarding the corporate attorney-client privilege—to independent contractors. Because I would decline to expand *Youngs* to allow ex parte privileged communication between MultiCare and Dr. Patterson, I respectfully dissent in part.

FACTS

In September 2015, Doug Hermanson received care at Tacoma General Hospital (owned by MultiCare) following an automobile accident. Hermanson was primarily treated by Dr. Patterson, an employee of Trauma Trust working as an independent contractor for MultiCare.[1] Hermanson was also treated by a number of MultiCare employees: two nurses, a crisis intervention social worker, and others not relevant here.

---

[1] Trauma Trust is a third-party entity created by MultiCare Health System and Franciscan Health System providing trauma services in the Pierce County area. Clerk's Papers at 474. Trauma Trust directly employs physicians and other medical personnel who deliver trauma care in contract partner hospitals.

During the course of Hermanson's treatment, an unknown worker at Tacoma General communicated the results of Hermanson's blood alcohol test to law enforcement investigating the car crash. Hermanson brought suit against MultiCare and multiple unidentified parties for unauthorized disclosure of confidential health information under RCW 70.02.020, violation of physician-patient privilege under RCW 5.60.060(4), and other claims. MultiCare entered into a joint representation agreement along with Trauma Trust and Dr. Patterson, even though neither Trauma Trust nor Dr. Patterson were named in Hermanson's complaint. Hermanson opposed the joint representation agreement and objected to MultiCare's counsel having ex parte communication with any of the nonparty health care providers involved with his care. This interlocutory appeal followed.

ANALYSIS

This case requires us to carefully consider the balance struck in *Youngs* between the physician-patient privilege and the corporate attorney-client privilege when the doctor who treated the plaintiff is a nonparty witness in litigation. Unlike in *Youngs*, the treating doctor here is not the defendant's employee. The majority nonetheless authorizes ex parte attorney-client privileged communications, based on an imprecise "functional equivalency" test borrowed from federal circuit courts in conflict with our own precedent. Worse yet, the majority applies this test on a record

that fails to establish how Dr. Patterson is in fact the functional equivalent of a MultiCare employee, especially in the face of a contract between MultiCare and Trauma Trust describing an independent contractor relationship. As a result, the majority disrupts the balance struck in *Youngs* and risks further erosion of the long-standing *Loudon* rule—a rule essential to the integrity of the physician-patient relationship.

I. The Majority Needlessly Expands *Youngs* To Include Agents and Independent Contractors Based on Inapplicable Federal Cases and an Erroneous Conclusion That Dr. Patterson Is the "Functional Equivalent" of a MultiCare Agent

The majority bases its agency determination on curious grounds. It borrows reasoning from federal cases that expanded the attorney-client privilege to some independent contractors. Majority at 11 (citing *In re Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994); *United States v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010)). But this court has already rejected such expansion: in *Newman v. Highland School District No. 203* we expressly refused to expand the corporate attorney-client privilege beyond the employer-employee context. 186 Wn.2d 769, 776-77, 381 P.3d 1188 (2016) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 394 n.3, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981) ("[W]e conclude *Upjohn* does not justify applying the attorney-client privilege outside the employer-employee relationship.")). The

majority attempts to distinguish *Newman* because the specific circumstances of that case involved former employees. Majority at 10-11. This reasoning misses the point. *Newman* did not limit its holding to former employees—it plainly held that the corporate attorney-client privilege does not apply to nonemployees. 186 Wn.2d at 780. Today's majority is not at liberty to disregard that holding in favor of a different rule adopted by select federal courts.

Even assuming the majority's newly adopted rule of agency law applies, it does not support allowing ex parte contact between MultiCare and Hermanson's treating physician here. The majority concludes a principal-agent relationship exists between MultiCare and Dr. Patterson by relying on a "functional equivalen[cy]" test from two federal circuit courts. Majority at 11 (citing *Bieter*, 16 F.3d at 938; *Graf*, 610 F.3d at 1159). But the Court of Appeals correctly distinguished these federal cases because they concerned independent contractors who "were enmeshed in the management structure." *Hermanson v. MultiCare Health Sys., Inc.*, 10 Wn. App. 2d 343, 360, 448 P.3d 153 (2019). In *Bieter*, the Eighth Circuit Court of Appeals observed that the independent contractor was the "sole representative" for the company at particular meetings and was "intimately involved" in the company's attempt to develop farmland. 16 F.3d at 938. Similarly, *Graf* concerned a nonemployee who regularly made marketing and management decisions on behalf

of the defendant company. 610 F.3d at 1157. In other words, these cases concerned agents with managerial responsibilities, who often served as spokespersons for the defendants in question. *Bieter*, 16 F.3d at 938; *Graf*, 610 F.3d at 1159.

The facts here are quite different. *Upjohn* requires analyzing the scope of attorney-client privilege on a case-by-case basis. 449 U.S. at 396. Nothing in the record in this case supports treating Dr. Patterson as the "functional equivalent" of a MultiCare employee. The majority notes Dr. Patterson had an office in a MultiCare facility and was monitored by MultiCare. Majority at 12. But these facts alone are insufficient to demonstrate an employee-like relationship that justifies application of the attorney-client privilege. There is no evidence Dr. Patterson played a part in managerial decisions made by MultiCare or was a corporate spokesperson.

To the contrary, the relevant evidence in the record describes an independent contractor relationship. The contract between MultiCare and Trauma Trust (Dr. Patterson's actual employer) unequivocally states that no employee/employer agency relationship exists between the two: "[E]ach party is an independent contractor with respect to the others. Except as expressly provided in this agreement, *no party is authorized or permitted to act or to claim to be acting as an agent or employee of any other party*." Clerk's Papers (CP) at 479 (emphasis added).

Presumably, MultiCare had good reason to structure its contract with Trauma Trust this way, including to limit its own liability.

The majority makes too much of MultiCare's current willingness to agree that Dr. Patterson is an agent.[2]  We should not allow a party to make an (apparently conditional) adverse admission to establish a beneficial privilege and thereby avoid the actual facts in the record.  The majority's willingness to do so results in failing to meaningfully grapple with the realities of corporate control over medical services and the pressures the corporate structure puts on both physicians and patients.

II. The Majority's Expansion of Ex Parte Contact with Treating Health Care Providers Will Undermine the Physician-Patient Relationship and Disrupt the Careful Balance Struck in *Loudon* and *Youngs*

Even if the record could support treating Dr. Patterson as MultiCare's agent, the majority's decision to depart from *Loudon* and expand *Youngs* beyond the direct employment context is unwise.  The relationship between physician and patient is a "fiduciary one of the highest degree . . . involv[ing] every element of trust, confidence and good faith."  *Lockett v. Goodill*, 71 Wn.2d 654, 656, 430 P.2d 589 (1967).  Our adoption of the rule against ex parte contact in *Loudon* recognized the importance of protecting this relationship, even in a litigation context in which the

---

[2] The majority states that "Dr. Patterson admitted he is MultiCare's agent."  Majority at 5.  In fact, it was MultiCare's chief medical officer who "admitted" Dr. Patterson was an agent, and the legal effect of this statement, if any, has not been established.  CP at 472.

plaintiff has waived the evidentiary privilege by putting their medical condition at issue. 110 Wn.2d at 677-678. We understood that patients are willing to disclose the most private details of their lives to their physicians, in large part, because they trust that this sensitive private information will be held in the utmost confidence and used only to further their own care. If a patient suspects their physician might betray this trust in ex parte conversations, the societal benefit of the relationship will be undermined and fully informed, quality medical care will suffer.

Recognizing the societal benefit of fostering full and frank communication between patients and their doctors, Washington's legislature codified the common law physician-patient privilege to safeguard the confidentiality of those communications. LAWS OF 1965, ch. 13, § 7(4) (codified at RCW 5.60.060(4)). We have previously identified two core purposes of the physician-patient privilege: "(1) to 'surround patient-physician communications with a cloak of confidentiality to promote proper treatment by facilitating full disclosure of information' and (2) 'to protect the patient from embarrassment or scandal which may result from revelation of intimate details of medical treatment.'" *Smith v. Orthopedics Int'l, Ltd., PS*, 170 Wn.2d 659, 667, 244 P.3d 939 (2010) (plurality opinion) (internal quotation marks omitted) (quoting *Carson v. Fine*, 123 Wn.2d 206, 213, 867 P.2d 610 (1994)).

Safeguarding the confidential relationship between health care providers and patients is more vital than ever in this modern era of increasingly consolidated corporate medicine. Though historically most doctors worked in small physician-owned practices, a shift has taken place in recent years, and today most doctors are either directly employed by or engaged as independent contractors by hospitals and other large corporate entities. *See* CAROL K. KANE, AM. MED. ASS'N, UPDATED DATA ON PHYSICIAN PRACTICE ARRANGEMENTS: FOR THE FIRST TIME, FEWER PHYSICIANS ARE OWNERS THAN EMPLOYEES (May 2019), https://www.ama-assn.org/system/files/2019-07/prp-fewer-owners-benchmark-survey-2018.pdf.[https://perma.cc/RGU6-T9S9] This shift often places physicians in a difficult position, with competing allegiances to the patients they serve and to the corporations that write their paychecks. These allegiances are inevitably tested when a patient brings a lawsuit against their doctor's corporate employer. Though the plaintiff patient waives the evidentiary privilege by putting their medical condition at issue, the societal interest in protecting the physician-patient relationship remains.

Over 30 years ago, we recognized that protecting this societal interest required adopting a bright-line rule that "defense counsel may not engage in ex parte contacts with a plaintiff's physicians." *Loudon*, 110 Wn.2d at 682. This rule recognizes that "[t]he mere threat that a physician might engage in private interviews with defense

counsel would, for some, have a chilling effect on the physician-patient relationship and hinder further treatment." *Id.* at 679.  Specifically, we emphasized (1) the need to ensure physicians maintain their ethical obligations under the Hippocratic Oath and the guidelines of the American Medical Association, (2) the possibility that ex parte contact could result in defense counsel being called at trial as an impeachment witness, and (3) the problematic nature of asking treating physicians— or defense counsel—to determine the relevancy of a plaintiff's medical information. *Id*. at 678-80.  We later identified another significant policy concern: the potential for defense counsel to utilize ex parte communications to improperly influence the treating physician. *Smith*, 170 Wn.2d at 669 n.2.   Any decision addressing modification of the bright-line *Loudon* rule must meaningfully engage with each of these concerns.

In *Youngs*, we considered the values underlying the *Loudon* rule in a direct employment context where the attorney-client privilege also weighed heavily.  179 Wn.2d at 650.  After carefully balancing the competing policy concerns, we held:

> [C]orporate defense counsel may have privileged ex parte communications with a plaintiff's nonparty treating physician only where the communication meets the general prerequisites to application of the attorney-client privilege, the communication is with a physician who has direct knowledge of the event or events triggering the litigation, and the communications concern *the facts of the alleged negligent incident.*

*Id.* at 664 (footnote omitted). This narrow exception to the *Loudon* rule was designed to "strik[e] the proper balance between the attorney-client and physician-patient privileges, limiting *Loudon*'s prophylactic protections to the extent necessary to protect a corporate defendant's right to fully investigate its potential liability." *Id.* at 665.

Today's majority disrupts this balance, giving undue weight to the interests of the corporate defendant at the expense of the plaintiff patient—and health care provider's—interests. I note the health care provider's interests because the court in *Youngs* recognized the risk that ex parte communications may result in "'inadvertent wrongful disclosures'" and present the possibility that defense counsel might be called at trial as an impeachment witness. *Id.* at 659-60 (quoting *Loudon*, 110 Wn.2d at 680).

*Youngs* further recognized that if the corporate attorney-client privilege were extended too far, it would "all but eviscerate *Loudon*," particularly "in the era of rapidly consolidating health care systems." *Id.* at 661. We emphasized that corporate counsel's ability to investigate did not encompass health care that was provided before or after the event triggering the litigation, such as care for preexisting conditions or postevent recovery. *Id.* at 671.

Our extensive discussion in *Youngs* grappling with the tensions between competing evidentiary privileges—and the policies underlying these privileges—exemplifies the length and depth of analysis necessary to do the meaningful balancing these questions present. The majority's analysis here, however, is all too brief and cursory. The majority relies on a single phrase in *Youngs* to broadly hold that the corporate attorney-client privilege essentially "trumps" the *Loudon* rule. Majority at 15. But we cannot disregard the additional language that reveals our holding was far more nuanced. *Youngs*, 179 Wn.2d at 652 ("We also reject the suggestion . . . that *Upjohn* completely trumps *Loudon*. It does not.").

The majority briefly acknowledges—but does not account for—two important policy concerns raised in *Loudon*. First, the majority recognizes how the "'mere threat that a physician might engage in private interviews with defense counsel would, for some, have a chilling effect on the physician-patient relationship and hinder further treatment.'" Majority at 7 (quoting *Loudon*, 110 Wn.2d at 679). Second, the majority describes how the *Loudon* rule ensures physicians are able to maintain their own professional ethical duties. *Id.* These are not trivial concerns. Without a foundation of trust, the physician-patient relationship crumbles, and health care outcomes suffer. It must be remembered that what MultiCare seeks, and what the majority grants, is the ability for defense counsel to have ex parte attorney-client

privileged communications with Dr. Patterson about Hermanson's health care. Absent will be the protections of formal discovery, where both plaintiff's and defense counsel are present to safeguard the parties' interests. If patients suspect their physicians are prioritizing their own self-interests—or worse, the interests of the physicians' corporate employer—then in all health care settings we can expect patients to hesitate in speaking candidly and completely.

*Youngs* intentionally set strict limitations on when and to what extent a physician employed by the defendant may engage in ex parte communication with corporate defense counsel for the purposes of investigating an alleged negligent event. 179 Wn.2d at 653. The majority offers insufficient justification for expanding this exception, and the imprecise functional equivalency test it adopts from federal cases fails to actually establish agency and conflicts with our holding in *Newman*. Balancing the competing evidentiary privileges and societal interests considered in *Youngs*, I would adhere to the *Loudon* rule in this case and protect the integrity of the physician-patient relationship.

## CONCLUSION

While the narrow decision in *Youngs* was justified by the attorney-client privilege, there is no justification for expanding the allowance of ex parte contact between defendant corporations and nonemployee treating physicians of the

plaintiff. The protections afforded by the *Loudon* rule are more important than ever in our modern era of increasingly consolidated corporate health care delivery. In *Loudon*, we were "unconvinced that any hardship caused the defendants by having to use formal discovery procedures outweighs the potential risks involved with ex parte interviews." 110 Wn.2d at 680. I remain unconvinced today.

Stephens, C.J.

Johnson, J.

González, J.

-14-